## In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

### Buena Vista Television, et al., Plaintiffs,

### v.

### Adelphia Communications Corp., et al., Defendants.

**Bankruptcy No. 02–41729–REG. Adversary No. 03–6967(REG).**

United States Bankruptcy Court, S.D. New York.

March 30, 2004.

---

Stinson Morrison Hecker LLP, by Darrell W. Clark (argued), Gregory O. Olaniran (argued), Michael E. Tucci, Washington, DC, Sargoy, Stein, Rosen & Shapiro, by Harvey Shapiro (argued), New York City, for Buena Vista Television, Metro–Goldwyn–Mayer Studios, Inc., Paramount Pictures Corp., and Sony Pictures Entertainment Inc.

Arnold & Porter, LLP, by Robert Alan Garrett, Hadrian R. Katz, Michael L. Bernstein (argued), Christopher Winters, Washington, DC, for Major League Baseball and Chicago White Sox.

Willkie Farr & Gallagher, LLP, by Roger Netzer (argued), Eilish M. Cahalan, New York City, Cole, Raywid & Braverman, LLP, by John D. Seiver, Wesley R. Heppler, Maria C. Moran, Washington, DC, for Adelphia Entities.

Kasowitz, Benson, Torres & Friedman, LLP, by Michelle L. Fivel, New York City, for Unsecured Creditors' Committee of Adelphia Communications Corp.

*DECISION ON MOTION FOR ORDER, PURSUANT TO 28 U.S.C. § 157(b)(3), FOR DETERMINATION AS TO WHETHER THIS ADVERSARY PROCEEDING IS A CORE PROCEEDING, AND REPORT TO DISTRICT COURT WITH RESPECT TO THAT ISSUE*

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of a case under chapter 11 of the

Bankruptcy Code, the district court (Hon. Jed Rakoff, U.S.D.J.) has requested this Court's views, in the context of a pending motion to withdraw the reference, with respect to whether the claims asserted by the plaintiffs in this action are "core," within the meaning of 28 U.S.C. § 157(b). The defendants have also moved, pursuant to 28 U.S.C. § 157(b)(3),[1] for a determination by the bankruptcy court with respect to this issue.

Upon consideration of that question, this Court determines that the plaintiffs are plainly incorrect in their assertion, in paragraph 29 of their motion to withdraw the reference,[2] when they say "[t]his action is a non-core matter." To the contrary, this Court finds that the claims are without question core, under 28 U.S.C. § 157(b) and as interpreted in the relevant caselaw, discussed below.[3]

*Facts*

The facts relevant to this Court's views—which in most respects are the issues to be determined in the adversary proceeding or the claims process; the legislative scheme under which the plaintiffs and defendants operate; and certain historical facts, such as the filing of a proof of claim in the bankruptcy court—are largely undisputed. The plaintiffs in this adversary proceeding (the "Copyright Owners") distribute television programming (such as movies, syndicated series and sports) subject to copyright protection. The defendants in this adversary proceeding— Adelphia Communications Corporation and a number of its operating subsidiaries (the "Adelphia Entities"), all debtors in chapter 11 cases in this Court—are cable television providers, retransmitting to their customers programming provided by the Copyright Owners. It is undisputed, on this state of the record, that the Copyright Owners do own the copyrights in question, and that the Adelphia Entities have retransmitted the Copyright Owners' programming.

However the Adelphia Entities, like cable systems generally, have been permitted by law to retransmit the Copyright Owners' programming, under a compulsory license, subject to the Adelphia Entities' compliance with the federal nonbankruptcy law that grants licenses of this character and requires payments for their use. Under section 111 of the Copyright Act, 17 U.S.C. § 111, cable systems engaged in the retransmission of television programming do not need the consent of the copyright owners to transmit that programming, and are not guilty of copyright infringement, so long as the cable systems pay semiannual royalties to the Copyright Office, which distributes the royalties to copyright owners. However, if a cable system fails to make the required royalty payment (which is due in arrears, after the retransmissions that caused the royalty payment to become due and payable), the cable system's previously authorized retransmission of the copyright owner's programming—assuming that such retransmission was "willful or repeated"—is

---

1. That section provides, in relevant part:
 The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection [157(b)] or is a proceeding that is otherwise related to a case under title 11.

2. Motion to Withdraw the Reference ("Withdrawal of Reference Motion") (ECF # 3) ¶ 29.

3. However, whether consideration of matters of federal non-bankruptcy law, with which the federal bankruptcy law must be harmonized, nevertheless makes withdrawal of the reference necessary or appropriate is of course a decision for the district court. This Court expresses no view with respect to that determination.

actionable as an act of copyright infringement.

The Copyright Owners claim that the Adelphia Entities committed such copyright infringement, post-petition, allegedly subjecting the Adelphia Entities to administrative expense liability of sums up to $3 billion, and entitling the Copyright Owners to injunctive relief barring retransmissions going forward, when the Adelphia Entities failed, after the filing date of their bankruptcy cases and before the deadline prescribed in regulations, to make a $7.5 million payment that was either entirely or almost entirely—depending upon a determination of bankruptcy law—on account of pre-petition debt. The Copyright Owners characterize their claim as one only for post-petition infringement and with respect to post-petition liabilities only. But the unpaid royalty obligation became payable in the pre-petition period, and not even the exact amount due changed as a consequence of post-petition events.[4] The Copyright Owners seek to divorce bankruptcy considerations from the analysis, and the Adelphia Entities seek to invoke them.

The relative timing of the retransmissions that triggered the royalty payment obligation and the duty to pay the Copyright Owners for the resulting royalties, and the filing of the Adelphia Entities' bankruptcy cases, is highly significant for the purposes of this dispute. As noted, the royalty payment was due in arrears. Under the Copyright Act and the regulations implementing it, royalty payments (along with "Statements of Account"—information submissions relevant to the duty to pay the royalties, and to compute the amount payable) are due semiannually, with respect to six-month periods running from January 1 through June 30, and from July 1 through December 31. For the six-month period January 1, 2002 through June 30, 2002 (the "Retransmissions Accounting Period"), the Adelphia Entities' royalty payment was due on or before August 29, 2002. However, five days before the end of the Relevant Retransmissions Accounting Period, the Adelphia Entities filed petitions for relief under chapter 11 of the Bankruptcy Code.

When the royalty payment was due, counsel for the Adelphia Entities submitted the Statements of Account for the Retransmissions Period, but did not send payment. He stated, in that connection:

> Please note that with respect to each of these Statements of Account, the entity listed in space B as the owner of the cable system has filed for relief under chapter 11 of the Bankruptcy Code. The royalties reflected on the enclosed forms are not included with these filings consistent with the provisions of the Bankruptcy code and a restraining order issued by the United States Bankruptcy Court for the Southern District of New York. A copy of the restraining order is attached hereto.[5]

A representative of the Copyright Office responded:

> We have received five hundred and fifty-seven Statements of Account for the above referenced cable system. You have informed us that Adelphia

---

4. In oral argument before this Court, copyright counsel for the Copyright Owners advised this Court that the royalty amount payable on July 1, at the end of the Retransmissions Accounting Period, was the same amount as the royalty amount due on June 24, the last day of the pre-petition period.

See Tr. of Argument of Mar. 22, 2004 ("Arg.Tr.") at 62, 70–71.

5. Ltr. of Adelphia Entities' counsel Seth Davidson to Library of Congress Copyright Office Licensing Division, dated Aug. 29, 2002, Netzer Reply Decl. Exh. A.

Communications Corporation/Tele Media Company are currently undergoing bankruptcy proceedings and the royalty reflected on the enclosure was not included.

We will exam[ine] the statements, and request that any errors or omissions detected be corrected. Royalty payments should be remitted to this Office in accordance with the manner which you are required to do so through the bankruptcy proceedings.[6]

It is fundamental as a matter of bankruptcy law that the Adelphia Entities' chapter 11 filing prohibited them from paying the royalty obligation for the Retransmissions Accounting Period if (or to the extent) that obligation represented pre-petition debt. Plainly, 175 of the 181 days of the Retransmissions Accounting Period was pre-petition, and, without dispute, a royalty payment was due and payable on August 29, after the Filing Date, as a consequence of the pre-petition retransmissions during that 175 day period. Copyright counsel for the Copyright Owners stated that the royalty payment due as a consequence of *all* of the retransmissions during the Retransmissions Accounting Period was the same as the amount due as a consequence of the retransmissions during the pre-petition 175 days.[7]

With respect to all six-month accounting periods prior to the Retransmissions Accounting Period, the Adelphia Entities consistently made all required payments.

Similarly, for the retransmissions accounting period for the second half of 2002 (the entirety of which was post-petition), and all retransmissions accounting periods thereafter, the Adelphia Entities made all required royalty payments.

Whether the royalty obligation that was unpaid on August 29, 2002 constituted a single pre-petition claim—or constituted multiple obligations (perhaps, according to the Copyright Owners' logic, 181 of them), one or more of which were post-petition claims—is a matter of sharp dispute. But the parties do not dispute that under Copyright Office pronouncements, the royalty became due, for each and every retransmission made during the Retransmissions Accounting Period, at the time the first retransmission was made.[8]

The royalty that would have been due under the Statement of Account for the entire six-month Retransmissions Accounting Period was approximately $7.5 million. The Copyright owners argue (and it appears to be undisputed) that the same amount was due and owing with respect to the transmissions during the six days constituting the post-petition period, and both sides agree that the same amount was due and owing as of the last day of the pre-petition period. It thus appears that the incremental royalty due with respect to the post-petition period was zero, but that the Copyright Owners have nevertheless seized on the nonpayment of the royalty—which without dispute includes sums due for pre-petition retransmissions—to sub-

---

**6.** Ltr. of Copyright Office Licensing Division's Willie Adams to Adelphia Entities' counsel Seth Davidson, dated Apr. 11, 2003, Netzer Reply Decl. Exh. B (apparent typographical error corrected).

**7.** See n. 4 *supra*.

**8.** District Court Argument Tr. 41–42. Counsel for the Copyright Owners continued to observe that the Adelphia Entities carried the

Copyright Owners' product for five days after the bankruptcy was filed, and that "as a matter of copyright law, they have to pay the entire license." *Id.* at 42. Of course it would seem to be likewise true that if, as the Adelphia Entities argue, they carried the Copyright Owners' product for the 175 days (or any period) *before* the filing of their chapter 11 cases, they were equally liable "to pay the entire license."

ject the Adelphia Entities to the alleged infringement liability.

The Copyright Owners have not disputed that the retransmission of the Copyright Owners' programming during the Retransmissions Accounting Period was authorized at the time—in each of the pre-petition and post-petition portions of that period. The retransmission became unauthorized, and assertedly infringement, only retroactively after August 29, when the royalty payment was not made.

On December 2, 2003, the Copyright Owners commenced a separate plenary action against 11 individuals—directors and/or officers associated with the Adelphia Entities [9] (including two who were not with Adelphia at any time during the Retransmissions Accounting Period, or at the time the royalty payment was due) [10]—in the district court (the "D & O Action"), charging the individuals with copyright infringement as a consequence of the Adelphia Entities' failure to pay the royalty. On the same day or shortly after, the Copyright Owners commenced this adversary proceeding in the bankruptcy court. The Copyright Owners have announced a desire to seek to consolidate this adversary proceeding with the action they brought against the Adelphia Entities' directors and officers in the district court.

In the adversary complaint, the Copyright Owners do not seek an order requiring the payment of the portion of the royalty that was not a pre-petition obligation, which, depending upon determinations of bankruptcy law to be made here or in the district court, would be $7.5 million; a very small percentage (roughly 4%) of that; or zero. Rather, they seek to set off a series of falling dominoes: damages of up to $500 million,[11] with respect to the Retransmissions Accounting Period; a judgment that the Adelphia Entities infringed in periods *after* the Retransmissions Accounting Period (even though the Adelphia Entities paid all required royalties with respect to such periods), with additional damages of up to $2.5 billion; and an injunction prohibiting further retransmissions of the Copyright Owners' programming.

Apparently recognizing the possibility, if not likelihood, that much or all of the unpaid royalty obligation, and/or their alleged infringement claim, would be a pre-

---

**9.** One of them, sued as Leslie L. Ge*r*ber, is, to the Court's understanding, Leslie L. Ge*l*ber.

**10.** Two of the individual defendants in the D & O Action, Rod Cornelius and Anthony Kronman—directors who joined the Adelphia Board following efforts on Adelphia's part to recruit new directors after the Rigas era—did not join the Adelphia Board until October 22, 2002, months after the filing of the Adelphia Entities' chapter 11 cases and the August 29, 2002 date that the royalty payments were due.

On October 22, 2002, this Court entered an order (ECF # 922), after a hearing on an unopposed motion by the Debtors (see ECF ## 851, 921), providing, *inter alia*, that indemnification agreements with each new director (defined in the order as a "New Director") were approved, and that "any

claim by a New Director for compensation or for indemnification based on acts or omissions occurring on or after June 25, 2002, shall constitute an administrative expense claim."

**11.** In doing *so*, they relied on 17 U.S.C. § 504(b), asserting that under that section, "actual damages are defined by the actual damages suffered by the copyright owner and 'any profits of the infringer that are attributable to the infringement....' " They further quoted section 504(b):

In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the element of profit attributable to factors other than the copyrighted work.

petition claim, the Copyright Owners,[12] joined by 191 other copyright owners, shortly thereafter filed 93 proofs of claim in the Adelphia Entities' chapter 11 cases, which are jointly administered. All of the proofs of claim contained identical attachments setting forth the stated basis for the claims.[13] Except that it referred to retransmissions during the period January 1, 2002 through June 25, 2002 (rather than June 25, 2002 through June 30, 2002), each proof of claim made exactly the same claims as those here:

> The Copyright Owners own copyrights in certain programs broadcast by over-the-air television stations. During the period of January 1, 2002 through June 25, 2002, the Debtor's cable systems retransmitted such programs (a) without the Copyright Owners' permission and (b) without complying with the requirements of the cable compulsory license set forth in 17 U.S.C. 111 ("Compulsory License"), that is, without paying the royalty specified by Section 111(d)(1)(B). Those retransmissions constituted copyright infringements under 17 U.S.C. § 111(c)(2)(B) and 17 U.S.C. § 501, for which the Debtor is liable....

> Where, as here, a cable system fails to pay the royalties required by the Compulsory License, the cable system and certain responsible individuals are liable for all copyright infringement that occurs during the relevant period. When the Compulsory License fee was not deposited with the Copyright Office for the period of the retransmission (which were [*sic*] due on August 29, 2002, 37 C.F.R. § 201(c)), the Debtor became liable for infringement and therefore ineligible for the Compulsory License as a defense to liability for copyright infringement.

Some of the Copyright Owners have brought suit against Debtor and some of its cable system subsidiaries for their post-petition acts of infringement. That lawsuit is pending in the U.S. Bankruptcy Court for the Southern District of New York as Adversary Proceeding No. 03–6967 (the "Adversary Proceeding"). Some of the Copyright Owners have also brought suit against the officers and directors of the Debtor based on their contributory and vicarious liability for the infringing conduct. This lawsuit is pending in the U.S. District Court for the Southern District of New York as Civil Action No. 03–CV–9555 (JSR).[14]

The relationship, and commonality of issues, as between each of such proofs of claim and this adversary proceeding (and, for that matter, the D & O Action) is apparent.

The Copyright Owners qualified each claim by stating that they believed that all amounts sought as damages in this Adversary Proceeding constituted an administrative priority in the Adelphia chapter 11 cases, but that to the extent it might be determined that any amount sought in the Adversary Proceeding was not entitled to administrative expense priority, they asserted an unsecured nonpriority claim for those amounts.[15]

The Copyright Owners filing those proofs of claim included several reservations of rights:

> To the extent that any amounts claimed in this Proof of Claim are entitled to allowance and payment as an administrative expense, the Copyright Owners reserve the right to file a re-

---

**12.** If any of the Copyright Owners did not file a Proof of Claim, the Copyright Owners have not relied on that.

**13.** *See,* as an example, Netzer Decl. Exh. A.

**14.** *Id.,* Attachment to Proof of Claim, at 1–2.

**15.** *Id.* at 3.

quest for allowance and payment of such administrative expense, and the inclusion of such amounts in this Proof of Claim is not intended to prejudice any such administrative expense claim.[16]

They followed that by a second, purported, reservation of rights:

> The Copyright Owners do not intend, by filing this Proof of Claim, to consent to the jurisdiction of this Court over any matter or to waive any right, including without limitation the right to a jury trial over any matter that is triable to a jury, the right to seek mandatory or discretionary withdrawal of the reference with respect to any matter, or the right to seek abstention with respect to any matter.[17]

Unless the Copyright Owners succeed in a threatened effort to withdraw the reference even with respect to an objection by the Adelphia Entities to their Proofs of Claim [18]—which absolutely would be a core matter [19]—objections to the allowability of the proofs of claim would be adjudicated in the bankruptcy court.

### Discussion

### I.

The ability of a bankruptcy court to determine the issues in this or any other adversary proceeding rests on jurisdiction conferred under two related, but very distinct, provisions of the Judicial Code, 28 U.S.C. The first of them, 28 U.S.C. § 1334,[20] confers subject matter jurisdiction on the district courts (and hence bankruptcy courts) with respect to bankruptcy matters; it applies to both district and bankruptcy courts. The second, 28 U.S.C. § 157,[21] addresses the extent to which an Article I bankruptcy judge (in contradistinction to the district court, with an Article III district judge) is empowered to hear and determine issues with respect to which the district court (and hence bankruptcy court) has subject matter jurisdiction under 28 U.S.C. § 1334. As an understanding of 28 U.S.C. § 1334 is necessary to understand 28 U.S.C. § 157 and the caselaw construing it, the Court turns to 28 U.S.C. § 1334 first.

### A.

After providing, in its subsection (a), that the district courts have jurisdiction (and, indeed, exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here),[22] 28 U.S.C. § 1334 provides, with respect to *proceedings* (which include, in

---

**16.** *Id.*

**17.** *Id.* It may be, as stated in this paragraph, that the Copyright Owners did not "intend," by filing the Proof of Claim, to consent to the jurisdiction of the bankruptcy court or to waive the right to a jury trial, but under the holdings of many courts, including the United States Supreme Court, that was the effect. See below.

**18.** Copyright Owners' Opp. Mem. at 7 n. 4.

**19.** *See* 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are not limited to . . . allowance or disallowance of claims against the estate . . .").

**20.** Not surprisingly, 28 U.S.C. § 1334 lies in close proximity to sister provisions in the Ju-

dicial Code addressing the subject matter jurisdiction of the District courts. *See, e.g.,* 28 U.S.C. §§ 1331 (federal question jurisdiction); 1332 (diversity jurisdiction); 1333 (admiralty jurisdiction); and 1338 (patents, copyrights and trademarks).

**21.** Section 157 lies in a separate, Chapter 6, of the Judicial Code, dealing with bankruptcy courts and Bankruptcy Judges, and appeals from their decisions.

**22.** "Cases," as used in 28 U.S.C. § 1334 and in bankruptcy parlance, is a word of art. A "case" is that which is commenced by the filing of a petition for relief under sections 301, 302, 303 or 304 of the Bankruptcy Code (what the Adelphia Entities commenced on June 25, 2002), and refers to the umbrella

addition to contested matters in cases, adversary proceedings like this one):

> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings [1] arising under title 11, or [2] arising in or [3] related to cases under title 11.

The three types of jurisdiction that district (and hence bankruptcy) courts thus may exercise are "arising under" and "arising in" jurisdiction (which the Court regards as species of federal question jurisdiction), and "related to" jurisdiction.

■ "Arising under" jurisdiction relates to federal question claims of a particular type—those federal questions that have their origin in title 11 of the United States Code (*i.e.,* the Bankruptcy Code),[23] and where relief is sought based upon a right created by title 11.[24] Significantly here,

they include requests for payment of administrative expenses from an estate, and requests to secure the priority over claims of unsecured creditors associated with administrative expenses, under sections 503 and 507 of the Code—which are core matters that a bankruptcy judge, and not just a district judge, can decide.

■ Cases in this district have stated that a claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy case, because it has no existence outside of bankruptcy.[25] Other decisions (including two at the court of appeals level) have stated it more broadly—that a proceeding "arises in" a bankruptcy case when it is not based on any right expressly created by Title 11 but would have no practical existence but for the bankruptcy.[26] Claims against the estate are in this category, even pre-petition ones based on state law.[27] Many "arising

---

case under which many individual proceedings—applications, motions, contested matters and adversary proceedings—are heard, and, if necessary, litigated. It is the modern way of referring to what was commonly referred to as a "proceeding" under the former Bankruptcy Act. Now, by contrast, a "proceeding" as used in 28 U.S.C. § 1334 is a matter that comes up in a "case," or is a separate proceeding (like an adversary proceeding) brought in connection with a "case." *See ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Communications Corp.) ("ML Media Partners"),* 285 B.R. 127, 136 n. 29 (Bankr.S.D.N.Y.2002) (Gerber, J.), explaining the modern parlance.

**23.** Thus it has been held that "[t]o determine whether a proceeding 'arises under' title 11, we apply the same test used for deciding whether a civil action presents a federal question under 28 U.S.C. § 1331." *In re Poplar Run Five Ltd. P'ship,* 192 B.R. 848, 855 (Bankr.E.D.Va.1995) (Bostetter, C.J.) (*"Poplar Run Five"*) (citations omitted).

**24.** *See, e.g., Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir.1987); *National City*

*Bank v. Coopers and Lybrand (In re Wickes),* 802 F.2d 990, 994 (8th Cir.1986); *In re Riverside Nursing Home,* 144 B.R. 951, 955 (S.D.N.Y.1992) (Broderick, J.);. *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),* 302 B.R. 792, 801 (Bankr. S.D.N.Y.2003) (Gerber, J.) (*"Sterling Optical"*) (citing the earlier S.D.N.Y. cases).

**25.** *See Riverside Nursing Home,* 144 B.R. at 955; 176–60 *Union Turnpike v. Howard Beach Fitness Center,* 209 B.R. 307, 311, n. 2 (S.D.N.Y.1997) (Sprizzo, J.).

**26.** *Bergstrom v. Dalkon Shield Claimants' Trust (In re A.H. Robins Co., Inc.),* 86 F.3d 364, 372 (4th Cir.1996); *see also, e.g., Grausz v. Englander,* 321 F.3d 467, 471 (4th Cir.2003) (same, *quoting A.H. Robins*); *Poplar Run Five,* 192 B.R. 848 at 857 (same, and noting that it applied to matters involving pre-petition claims, even when based on state law).

**27.** *See Poplar Run Five,* 192 B.R. at 857:

A proceeding that involves state-law questions may still fall within the "core" jurisdiction of this Court if it "arises in" a case under title 11.... One example of a pro-

under" matters litigated in bankruptcy cases also fall in the "arising in" category, and vice-versa.

 "Related to" jurisdiction relates to those matters that are not in the first two categories that nevertheless relate to a bankruptcy case. The principles underlying "related to" subject matter jurisdiction determinations were discussed at some length in this Court's decisions in *ML Media Partners*[28] and *Blackacre Bridge Capital, LLC v. Korff (In re River Center Holdings, LLC)*,[29] and will not be repeated at length here. As Chief Judge Mukasey of the district court noted when considering an earlier "related to" issue under section 1334(b):

> The Third Circuit articulated what has become the prevailing definition of "related [to]" jurisdiction: "[A] civil proceeding is related to bankruptcy [if] . . . *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or the debtor's property. An action is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or

negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[30]

This test is often referred to as the "conceivable effects" test, or the *"Pacor* test."[31]

After the Second Circuit's decision in *In re Cuyahoga Equipment Corp.*,[32] decided shortly after Chief Judge Mukasey decided *Weisman,* it is now clear that in this Circuit, as elsewhere, the *Pacor* test is utilized, and the existence of a "conceivable effect" on the bankruptcy estate now establishes "related to" jurisdiction under section 1334(b).

### B.

With that by way of background, the Court then turns to 28 U.S.C. § 157, and the standards for determining whether a matter is "core" within the meaning of that section. Preliminarily, § 157(a) authorizes the district courts to refer the matters for which district courts have subject matter jurisdiction under 28 U.S.C. § 1334 to the bankruptcy judges of their districts.[33] Then, § 157(b) lays out the power of bankruptcy judges to decide matters after such

ceeding "arising in" a bankruptcy case is a matter involving the allowance or disallowance of claims. The Bankruptcy Code requires a creditor to file a proof of claim as the first step for receiving a distribution from the estate. *See* 11 U.S.C. §§ 501, 502(a). Although the Bankruptcy Code authorizes such filing, the issue of whether the claim is bona fide, and thus allowable, may ultimately turn on state law.

**28.** 285 B.R. at 136–137.

**29.** 288 B.R. 59 (Bankr.S.D.N.Y.2003) (Gerber, J.)

**30.** *Weisman v. Southeast Hotel Properties Ltd. Partnership,* 1992 WL 131080, at *3 (S.D.N.Y. 1992) (Mukasey, C.J.) *("Weisman")* (emphasis in the original) (quoting *Pacor, Inc. v. Higgins,*

743 F.2d 984, 994 (3d Cir.1984), and finding subject matter jurisdiction to exist); *accord Hunnicutt Co. v. TJX Companies, Inc. (In re Ames Department Stores, Inc.),* 190 B.R. 157, 160 (S.D.N.Y.1995) (Koeltl, J.) *("Hunnicutt")* (also finding subject matter jurisdiction to exist).

**31.** *ML Media,* 285 B.R. at 137.

**32.** 980 F.2d 110 (2d Cir.1992) *("Cuyahoga Equipment").*

**33.** An order of that character was entered in the Southern District of New York substantially contemporaneously with the passage of 28 U.S.C. § 157, and it remains in effect today. *See* Standing Order of Reference of Acting Chief Judge Robert J. Ward, dated July 10, 1984.

a reference. The first of § 157(b)'s three subsections, § 157(b)(1), provides that:

Bankruptcy judges may hear and determine all cases under title 11 and all *core* proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.[34]

The second of the three subsections, § 157(b)(2), then provides that "core proceedings include, but are not limited to," 15 enumerated categories of matters.[35] Finally, the third of those subsections,

§ 157(b)(3), provides in relevant part that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

Congress enacted § 157 in 1984, following the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*[36] As the First Circuit described the *Marathon* issues and holding in *Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.)*,[37] the *Marathon* court ruled that the bankruptcy court lacked the constitutional power to

---

**34.** 28 U.S.C. § 157(b)(1) (emphasis added).

**35.** Subsection (b)(2) provides, in full:
(2) Core proceedings include, but are not limited to—
(A) matters concerning the administration of the estate;
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
(D) orders in respect to obtaining credit;
(E) orders to turn over property of the estate;
(F) proceedings to determine, avoid, or recover preferences;
(G) motions to terminate, annul, or modify the automatic stay;
(H) proceedings to determine, avoid, or recover fraudulent conveyances;
(I) determinations as to the dischargeability of particular debts;
(J) objections to discharges;
(K) determinations of the validity, extent, or priority of liens;
(L) confirmations of plans;
(M) orders approving the use or lease of property, including the use of cash collateral;
(N) orders approving the sale of property other than property resulting from claims

brought by the estate against persons who have not filed claims against the estate; and
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

**36.** 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (*"Marathon"*). *See generally PSINet, Inc. v. Cisco Systems Capital Corp. (In re PSINet,, Inc.)*, 271 B.R. 1, 9–10 (Bankr. S.D.N.Y.2001) (Gerber, J.) (*"PSINet"*) (explaining the law in this area, and concluding, among other things, that an Article I bankruptcy judge could determine the issues presented there).

**37.** 815 F.2d 165, 166 (1st Cir.1987) (*"Arnold Print Works"*). The *Arnold Print Works* analysis, in an opinion authored by then Judge, now Supreme Court Justice, Breyer, has frequently been cited by the Second Circuit and other courts in analysis of *Marathon* and its Supreme Court progeny. *See, e.g., Ben Cooper, Inc. v. The Insurance Co. of the State of Pennsylvania (In re Ben Cooper, Inc.)*, 896 F.2d 1394, 1399 (2d Cir.) (*"Ben Cooper"*), *vacated and remanded*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated on remand*, 924 F.2d 36 (2d Cir.), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991); *Resolution Trust Corp. v. Best Products Co. (In re Best Products Co.)*, 68 F.3d 26, 31 (2d Cir.1995) (*"Best Products"*).

adjudicate a debtor's state law contract suit for damages, where the debtor's claim arose before the filing of the debtor's bankruptcy petition.[38] As a consequence, Congress enacted legislation after *Marathon* to cure the constitutional defect in its earlier bankruptcy-related provisions in 28 U.S.C. that the *Marathon* court found.[39] The new jurisdictional provisions distinguished between "core" bankruptcy proceedings and those that were merely "related to" title 11 cases. Representative Kastenmeier, one of the amendment's co-sponsors, explained that core proceedings are "integral to the core bankruptcy function of restructuring debtor-creditor rights," and include "all necessary aspects of a bankruptcy case."[40] Non-core proceedings, by contrast, were "*Marathon*-type suits," by which they meant claims "concerned only with State law issues that did not arise in the core bankruptcy function of adjusting debtor-creditor rights."[41]

With both the caselaw and legislative history to guide it, the First Circuit, in *Arnold Print Works*, held that in the matter before it—a suit by the estate, as plaintiff, on a breach of a *post*-petition contract—was core, even though it was a suit for breach of contract under state law. The First Circuit held first that the contract in question was covered under at least two of the subsections of § 157(b)(2), and then held that deeming the matter to be core was constitutionally permissible. In connection with its first holding, the First Circuit noted the legislative intent of § 157 that " 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits," and that jurisdiction in core bankruptcy proceedings would be "broader than the summary jurisdiction under pre 1978 law."[42] And the First Circuit recognized that the authors of § 157(b) also spoke of core proceedings as those "integral to the core bankruptcy function of *restructuring debtor-creditor rights*,"[43] and that "this last italicized phrase was not meant to restrict core proceedings to competing claims directly against the estate," but rather "referred generally to all proceedings that are '*non-Marathon*' bankruptcy matters."[44]

The Second Circuit has issued seven major decisions addressing the scope of

---

**38.** *See Arnold Print Works,* 815 F.2d at 166.

**39.** *See id.* at 166–167.

**40.** *Id.* at 167 (quoting 130 Cong. Rec. E1109 (daily ed. March 20, 1984)).

**41.** 815 F.2d at 167.

**42.** *Id.* at 168. The Second Circuit has repeatedly stated this as well. *See In re Crysen/Montenay Energy Co.,* 226 F.3d 160, 166 (2d Cir.2000) ("We have explained that bankruptcy jurisdiction [is] to be construed as broadly as possible within ... constitutional constraints"); *Ben Cooper,* 896 F.2d at 1398 ("bankruptcy jurisdiction was to be construed as broadly as possible within the constitutional constraints of *Marathon*"); *Best Products,* 68 F.3d at 31 ("In [*Ben Cooper*], ... we quoted with approval the First Circuits analysis of

the legislative history of section 157: [T]he legislative history of [section 157] indicates that Congress intended that core proceedings would be interpreted broadly, close to or congruent with constitutional limits") (brackets in original); *Petrie Retail,* 304 F.3d at 229 ("Therefore, we construe *Marathon* narrowly and give core proceedings a broad interpretation that is close to or congruent with constitutional limits") (internal quotation marks deleted).

Indeed the Second Circuit has also noted, as did the First Circuit, that "the sponsors repeatedly said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings." *Arnold Print Works,* 815 F.2d at 168.

**43.** *Id.* at 169 (emphasis in original).

**44.** *Id.* (emphasis in original).

core proceedings,[45] and in only one of them—a variant of a *Marathon*-type action, in which the debtor was a *plaintiff*[46]—has the Second Circuit found a matter to be non-core. They were discussed at considerable length in this Court's decision in *PSINet* and its post-*PSINet* decision in *Sterling Optical*, and with the exception of a few of them, which are particularly relevant here and are discussed at greater length below, they need not be discussed at comparable length here.

As noted above, 28 U.S.C. § 157(b) begins by stating that "core proceedings *include, but are not limited to*," 15 enumerated categories of matters.[47] The enumerated matters include, under section 157(b)(2)(B), with exceptions not relevant here, "allowance or disallowance of claims against the estate ...,"[48] and as

the introductory language of § 157(b)(2) makes clear, and the Second Circuit has held,[49] the list is not exclusive. Consideration of whether the claims here are core or non-core thus requires consideration and application to the facts here of both the caselaw construing the enumerated items and the caselaw explaining core doctrine generally.[50]

## II.

### A.

As noted above, the Copyright Owners, joined by 191 other copyright owners, shortly filed 93 proofs of claim in the Adelphia Entities' chapter 11 cases, containing identical attachments setting forth the stated basis for the claims. As also noted above, except for the date upon

**45.** See *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384 (2d Cir.1990) ("*Manville Forest Products*"); *Ben Cooper; Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1102 (2d Cir.1993), *cert dismissed* 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994) ("*Orion*"); *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702 (2d Cir.1995) ("*S.G. Phillips*"); *Best Products; United States Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Ass'n, (In re United States Lines, Inc.)*, 197 F.3d 631 (2d Cir.1999) ("*U.S. Lines*"); *Luan Investment, S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223 (2d Cir.2002).

**46.** See *Orion*. For that reason, in particular, *Orion* is easily distinguishable here. It is discussed further below.

**47.** Emphasis added.

**48.** The Adelphia Entities argue that two other subsections, 157(b)(2)(A), "matters concerning the administration of the estate, and 157(b)(2)(O), other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship," are also ap-

plicable—in the first instance by reason of the monstrous effect that the relief the Copyright Owners seek would have on their ability to reorganize, and in the second by reason of the Copyright Owners' effort to elevate an obligation that had its origins in a pre-petition claim to a much larger claim with administrative expense priority over other creditors. But the Court does not need to consider whether those arguments provide additional bases for finding this adversary proceeding to be a core matter, as the applicability of subsection 157(b)(2)(B) is so obvious, and the caselaw makes the result so clear.

**49.** See, e.g., *Ben Cooper*, 896 F.2d at 1398 ("In § 157(b), Congress provided a *non-exclusive* list of proceedings which it deemed core") (emphasis added).

**50.** See *PSINet*, 271 B.R. at 13 ("[S]ince § 157(b)(2) expressly provides that core matters *are not limited to* the enumerated matters and the caselaw has recognized this, and because the caselaw has substantially fleshed out the rationale of § 157(b), review of the caselaw is necessary to determine whether the recharacterization adversary proceeding here should be regarded as core, even if it does not fit within one of the 15 enumerated categories") (emphasis in original; footnote citation omitted).

which the claims were asserted to arise, the claims as set forth in the proofs of claim and in the adversary proceeding here were in all material respects identical. Both assert the Copyright Owners' rights in the programming the Adelphia Entities retransmitted; both discuss and rely upon the compulsory licensing scheme; both claim that the Adelphia Entities were obligated to pay the royalty to the Copyright Office on August 29, 2002, in a single payment for the Retransmissions Accounting Period; and both allege that the Adelphia Entities became copyright infringers and ineligible for the Compulsory License as a defense to liability for copyright infringement when the payment was not made on August 29 of that year.[51] And except for the fact that an attempt to secure administrative expense priority over other creditors raises additional bankruptcy issues that are not also present in a pre-petition claim, the issues are in all material respects identical as well.

■ As the Supreme Court's decisions in *Katchen v. Landy*[52] and its progeny[53]—particularly *Langenkamp*—make clear, when the Copyright Owners filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of this Court, especially with respect to the very subject matter of their claims.[54] Additionally, the Copyright Owners thereby triggered the claims allowance process. As the Supreme Court noted in *Langenkamp*:

In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power.[55]

That conferred jurisdiction upon the bankruptcy court to consider the Copyright Owners' claims as a core matter, under both the express language of 28 U.S.C. § 157(b)(2)(B), and the more generalized caselaw addressing the nature of core matters. As in *Katchen*, having filed claims, the Copyright Owners subjected themselves to the bankruptcy court's equitable power-triggering the claims allowance process, which is at least a matter "arising in" cases under title 11.

■ This adversary proceeding is thus a core matter for that reason alone. As the Second Circuit has held:

Because [n]othing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor, the bankruptcy courts determination whether to allow or disallow a claim is a core function.[56]

Also relevant to this determination is the decision by the district court in this district in *Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*.[57] There Judge

---

**51.** *See* page 11 above.

**52.** 382 U.S. 323, 329, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (*"Katchen"*).

**53.** *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58–59 & n. 14, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (*"Granfinanciera"*); *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (*per curiam*) (*"Langenkamp"*).

**54.** *See Sterling Optical*, 302 B.R. at 803–804 (citing the Supreme Court cases).

**55.** 498 U.S. at 44, 111 S.Ct. 330, quoting *Granfinanciera*, 492 U.S. at 58–59, and n. 14, 109 S.Ct. 2782.

**56.** *S.G. Phillips*, 45 F.3d at 705, *quoting In re BKW Sys., Inc.*, 66 B.R. 546, 548 (Bankr. D.N.H.1986).

**57.** 285 B.R. 822 (S.D.N.Y.2002) (Pauley, J.) (*"Iridium"*).

Pauley—deciding a motion to withdraw the reference with respect to an action brought by the Iridium Creditors' Committee, on behalf of the estate, against a contract counter-party, Motorola—addressed, as a threshold matter, the extent to which the claims before him were core or non-core. Five of the ten claims asserted against Motorola arose under provisions of the Bankruptcy Code, and would be core in any event, but the other five involved state law claims of breach of contract, breach of express and implied contractual warranties, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duty,[58] which normally would not be core claims.[59] But Motorola had filed a proof of claim against the Iridium estate,[60] along with claims seeking administrative expense priority.[61]

Relying on *Langenkamp* and the Second Circuit cases discussed above, Judge Pauley found even the normally non-core causes of action to be core under these facts. He noted the Second Circuit's holding in *Manville Forest Products* that the filing of a proof of claim would invoke the special rules of bankruptcy relating to objections to claims, and that "*a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.*"[62] Judge Pauley continued:

> It is with this understanding that the Second Circuit and courts in this district have consistently held adversary proceedings against a creditor that have traditionally been non-core to be core pursuant to §§ 157(b)(2)(B) and (c) due to the filing of a proof of claim or counterclaim of set-off/recoupment by that creditor.[63]

The Copyright Owners' papers on this motion failed even to cite, much less distinguish, *Katchen, Granfinanciera* and *Langenkamp,* and the Copyright Owners' efforts to address them at the oral argument on this matter, even after the Court raised those cases with them, were inadequate. The Copyright Owners did not seriously argue, as they could not, that the submission to bankruptcy court jurisdiction that results from the filing of a proof of claim is limited to the adjudication of the claim itself. *Katchen, Langenkamp* and their progeny uphold the imposition of bankruptcy jurisdiction even when the estate "goes on offense," as plaintiff, following the filing of a proof of claim, and consistently speak of submission to the jurisdiction of the *bankruptcy court,*[64] or its equitable jurisdiction,[65] to determine

58. *Id.* at 827.

59. *Id.*

60. *Id.* at 826.

61. *Id.* at 827.

62. *Id.* at 830, quoting *Manville Forest Products,* 896 F.2d at 1389–1390 (emphasis by the Second Circuit).

63. 285 B.R. at 831.

64. *Sterling Optical,* 302 B.R. at 803.

65. *See, e.g., Langenkamp,* 498 U.S. at 44, 111 S.Ct. 330 ("In *Granfinanciera,* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power"), citing *Granfinanciera,* 492 U.S. at 59 n. 14, 109 S.Ct. 2782 ("As *Katchen* makes clear, however, by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims . . .").

Given express language in *Langenkamp* (there in the context of a preference action by the trustee against an entity that had filed a proof of claim), this Court has difficulty understanding the basis for the Copyright Owners' assertions in this adversary proceeding that "the Copyright Owners have a right to a jury trial." Copyright

claims against estate, as a consequence of the filing of a proof of claim. They do not distinguish between matters in which the estate is a plaintiff seeking to recover additional assets (such as by recovery of preferences) and matters when the estate is defending a claim to share in the estate's own assets. The latter, which is what this Court has here, presents an even easier case. As the Supreme Court noted in *Katchen*, after the filing of a proof of claim:

> This power to allow or to disallow claims includes "full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based." [66]

Likewise, Judge Pauley observed in *Iridium* that:

> Traditionally non-core claims against a creditor in an adversary proceeding will be considered core if: (1) the claim arises out of the same transaction as the creditor's proofs of claim or setoff claim, or (2) the adjudication of the adversary proceeding claim would require consideration of issues raised by the proofs of claim or setoff claim such that the two claims are logically connected. [67]

With the extraordinary congruence between the Copyright Owners' pre-petition claims, as set forth in their proof of claim, and their post-petition claims as set forth in this adversary proceeding, Judge Pauley's observations in *Iridium* are exactly on point here.

Falling squarely within both prongs of Judge Pauley's analysis, the Copyright Owners' efforts to assert their allegedly post-petition claims in this adversary proceeding (1) arise out of the same transaction as their proof of claim, and (2) require consideration of issues raised by the proofs of claim such that the two are logically connected. [68] The Copyright Owners' effort to share in the Adelphia estate based on those same operative facts, but simply on different legal theories and with a priority over other creditors, does not make their claims any less core.

Owners' Mem. in Support of Motion to Withdraw Reference (ECF # 4) ("Withdrawal Motion Mem.") at 4; *accord id.* at 18. *See Langenkamp,* 498 U.S. at 44–45, 111 S.Ct. 330:

[T]he creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction.* As such, there is no Seventh Amendment right to a jury trial.... "[A] creditor's right to a jury trial on a bankruptcy trustee's preference claim depends on whether the creditor has submitted a claim against the estate." Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently they were not entitled to a jury trial on the trustee's preference action.

(emphasis in original; citations omitted).

*See also In re Leslie Fay Companies,* 222 B.R. 718, 720 (S.D.N.Y.1998) (Rakoff, J.) ("Finally, as to appellants' jurisdictionally related assertion that they were deprived of a jury trial, it is well settled that a creditor who voluntarily participates in the equitable reordering of a debtor's estate by filing a proof of claim has no jury trial rights with respect to proceedings that involve the allowance or disallowance of those claims," citing *Granfinanciera* and *Langenkamp*).

Assertion of a post-petition claim against assets of the estate likewise results in a forfeiture of the right to a jury trial. *See O'Neill v. New England Road, Inc.,* 2000 WL 435507, *7 (D.Conn.2000) (Underhill, J.) (*O'Neill*). (an administrative expense claim qualifies as an equitable claim to a pro rata share of the bankruptcy res, the assertion of which extinguishes otherwise available seventh amendment rights to a jury trial).

66. *Katchen,* 382 U.S. at 329, 86 S.Ct. 467.

67. 285 B.R. at 832.

68. *Id.*

## B.

 Even if the Copyright Owners had not filed proofs of claims, their efforts to assert post-petition claims against the Adelphia Entities, and thereby establish claims to the Adelphia estate *res* (and with priority over claims of other Adelphia creditors), at least under the facts here,[69] would likewise present a core matter.

The Copyright Owners have repeatedly stated, in words or substance, with respect to this adversary proceeding, that "any recovery against the Cable Defendants will be an administrative expense in their chapter 11 proceedings, since, among other things, it arises from postpetition acts."[70] Their desire to share in assets of this estate, on an administrative expense priority basis, is unmistakable. Indeed, the

$500 million damages claim in this adversary proceeding—especially since it is for the exact same amount sought under the proofs of claim—has no other purpose in life. It is grossly disingenuous, in this Court's view, for the Copyright Owners to argue, as they did in oral argument on this matter,[71] that they have not yet filed the administrative expense request, or to divorce the purpose of their damages claim from any administrative expense analysis.[72] And it cannot be the law that one can sidestep the claims process by simply *asserting* that a claim is post-petition, when in fact that is highly debatable; an argument of that character is in essence assuming the fact to be decided.

Claims for administrative expense priority—for "the actual, necessary costs and expenses of preserving the estate"—are

**69.** The Court notes that the injuries alleged by the Copyright Owners do not involve personal injury tort or wrongful death claims, which are expressly carved out by Congress from the bankruptcy court's core matter jurisdiction. *See Beck v. Victor Equipment Co.,* 277 B.R. 179, 180 (S.D.N.Y.2002) (Rakoff, J.) (" 'non-core proceedings under section 157(b)(2)(B)' consist, in turn, of proceedings that would result in 'the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11.' "); *cf. In re Twin Laboratories, Inc.,* 300 B.R. 836, 839 (S.D.N.Y.2003) (Rakoff, J.) (centralizing personal injury litigation in the district court, under 28 U.S.C. § 157(b)(5)).

**70.** Memorandum of Law In Support of Plaintiffs' Motion to Withdraw the Reference (ECF # 4) at 14; *accord* Attachment to Proof of Claim at 3, Netzer Decl. Exh. A:

To the extent that any amounts claimed in this Proof of Claim are entitled to allowance and payment as an administrative expense, the Copyright Owners reserve the right to file a request for allowance and payment of such administrative expense, and the inclusion of such amounts in this Proof of Claim is not intended to prejudice any such administrative expense claim.

The Copyright Owners believe that all amounts sought as damages in the Adversary Proceeding constitute an administrative priority in the Debtor's Chapter 11 cases. However, to the extent that it is determined by the final and nonappealable decision of a court of competent jurisdiction that any amount sought in the Adversary Proceeding is not entitled to administrative expense priority, Copyright Owners assert an unsecured nonpriority claim for such amounts.

**71.** Arg. Tr. 23, 26–27, 54–56.

**72.** In any event, distinctions of that character would be immaterial. *See PSINet,* 271 B.R. at 23 ("*PCH Associates [Liona Corp., N.V. v. PCH Associates (In re PCH Associates),* 60 B.R. 870, 872–873 (S.D.N.Y.) (Tenney, J.) ] stands as precedent for determining that a stand-alone adversary proceeding is core when it provides the underpinnings for the determination of separate contested matter core issues, and it can be fairly read for the proposition that when one considers whether an adversary proceeding raises core issues, it is appropriate to consider the reasons why the adversary proceeding was brought, and to see if its purpose or effect is a step to the determination of core matters").

asserted under section 503 [73] of the Bankruptcy Code, and are granted a priority under section 507(a)(1) [74] of the Code. "[T]he actual, necessary costs and expenses of preserving the estate" have been held, since the days of the old Bankruptcy Act, to also include post-petition torts committed by a trustee or debtor-in-possession, under the doctrine of *Reading Co. v. Brown*,[75] which the Copyright Owners likely will argue to be applicable here.[76] These issues arise under title 11 and arise in cases under title 11. All are core matters for that reason.

Additionally, this Court agrees with the Adelphia Entities' point [77] that 28 U.S.C. § 157(b)(2)(B) does not distinguish between pre-petition and post-petition claims, and that it rather broadly provides core jurisdiction for the allowance and disallowance of *claims* against the estate.[78] That is not surprising, as claims of both types seek to recover from the bankruptcy estate *res* (a *res* over which, even under the old Bankruptcy Act, the bankruptcy court had summary jurisdiction), and post-petition claims not only seek to recover from that *res*, but with a priority over creditors who have only pre-petition claims. Such a conclusion is also consistent with the broad language used by the Second Circuit in *S.G. Phillips*—" '[n]othing is more directly at the core of bankruptcy administration ... than the quantification of all *liabilities* of the debtor' " [79] language that was understandably broad, as post-petition claims against the estate

**73.** Section 503 provides, in relevant part:
(a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

**74.** Section 507(a)(1) provides, in relevant part:
(a) The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title. . . .

**75.** 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). The Bankruptcy Act had a provision from which Bankruptcy Code sections 503(b) and 507(a)(1) evolved. As quoted in *Reading Co. v. Brown*, Bankruptcy Act § 64a provided, in relevant part:
The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition * * *.
The *Reading Co. v. Brown* court, speaking through Justice Harlan, defined the issue before it with unusual clarity:
The question in this case is whether the negligence of a receiver administering an estate under a Chapter XI arrangement gives rise to an "actual and necessary" cost of operating the debtor's business. The Act does not define "actual and necessary," nor has any case directly in point been brought to our attention. We must, therefore, look to the general purposes of § 64a, Chapter XI, and the Bankruptcy Act as a whole. *Id.* at 476, 88 S.Ct. 1759 (footnote omitted).

**76.** Whether there was a post-petition tort here affording administrative expense priority under *Reading Co. v. Brown*, at least during the period June 25 to June 30 (when the retransmissions were authorized, only to have become retroactively unauthorized when the payment later due on August 29 was not made), is one of the several issues of bankruptcy law that will later have to be decided by this Court or the district court.

**77.** Adelphia Entities' Reply at 7 (ECF # 20).

**78.** Emphasis added.

**79.** 45 F.3d at 705 (citation omitted).

have an even greater effect upon creditor recoveries than pre-petition claims do. The Second Circuit has held, in this connection, that "[a] debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."[80] It also has held:

> Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.... "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute."[81]

Two district court decisions in this Circuit—one in Connecticut and one in this district—are relevant here. In *O'Neill*,[82] Judge Underhill observed, with respect to counterclaims against a debtor in an action the debtor had brought:

> Regardless of whether the counterclaims are pre- or post-petition, they are still claims against the debtor's estate and hence seek a piece of the res under the equitable jurisdiction of the bankruptcy court. The court can find no legal significance in the fact that the piece of the pie that NE Road seeks to carve out of the estate stems from post-petition conduct by the debtor. Resolution of post-petition claims are as much a function of the bankruptcy court's equitable apportionment of the estate as resolution of pre-petition claims.[83]

Similarly, in *Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*,[84] Judge Scheindlin observed:

> the natural reluctance of insurers to write new or additional coverage after the claims against the Rigases and other Adelphia officers and directors.
>
> As of the time the Court last dealt with the issue, there were more than 40 separate actions pending against officers and directors of Adelphia, *see* 285 B.R. at 582, and the docket in the multidistrict *Adelphia Communications Corp. Securities & Derivative Litigation*, now before Judge McKenna, shows 50 cases listed. The demands on the available insurance resulting from the numerous civil actions against the Rigases and the independent directors are likely to be enormous. It is unreasonable to expect that D & O Insurance will cover the claims asserted here, and if directors and officers are tagged with infringement liability resulting from the Adelphia Entities' failure to pay the royalty, it is fair to assume that they will claim over against the Adelphia estate, likely seeking administrative expense priority.

---

**80.** *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc. (In re McFarlin's, Inc.)*, 789 F.2d 98, 101 (2d Cir.1986) ("*McFarlin's*").

**81.** *Id.* at 100–101 (citations omitted), quoting *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952).

> *McFarlin's* concerns may raise another issue here, though that issue is not yet before the Court, except insofar as it may represent another issue of bankruptcy law to be decided by the district court or this Court. As of the time this Court addressed D & O Insurance issues in 2002 and 2003, see *Adelphia Communications Corp. v. Associated Electric & Gas Insurance Services, Ltd. (In re Adelphia Communications Corp.)*, 285 B.R. 580, 586 (Bankr.S.D.N.Y.2002), *vacated*, 298 B.R. 49 (S.D.N.Y.2003) (Baer, J.), *on remand*, 302 B.R. 439 (Bankr.S.D.N.Y. 2003), the D & O Insurance, including excess layers, provided $50 million in coverage. *See* 285 B.R. at 586; 302 B.R. at 443. That would cover 10% of the $500 million the Copyright Owners claim for the first alleged infringing period, and about 1.7% of the $3 billion they claim in total. The record does not reflect whether that coverage increased in any material way thereafter, though that does not seem likely, given

**82.** *See* n. 65 *supra.*

**83.** 2000 WL 435507 at *7.

**84.** 270 B.R. 108 (S.D.N.Y.2001) (Scheindlin, J.).

A finding that the City's purported "proofs of claim" were in fact claims for administrative expenses would not alter the conclusion that this is a core proceeding. Although administrative claims do not enjoy the same presumption of validity and accuracy as proofs of claim, a party claiming an administrative expense is entitled to priority over all unsecured creditors. Regardless of when the claims are made, "they are still claims against the debtor's estate and hence seek a piece of the res under the equitable jurisdiction of the bankruptcy court." Thus, "[r]esolution of postpetition [administrative expense] claims are as much a function of the bankruptcy court's equitable apportionment of the estate as resolution of prepetition [proofs of] claims." [85]

Still another case, *Snider v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc)*,[86] is closely on point. There the individual plaintiffs brought an adversary proceeding in the bankruptcy court against the debtor CFS, asserting post-petition WARN Act claims, and seeking to recover any resulting damages as an administrative priority. There,

as here, the plaintiffs claimed that commencement of an adversary proceeding against the estate was not an act equivalent to filing a proof of claim,[87] and that they had not asserted a "claim against the estate,"[88] but rather just a complaint seeking recovery for alleged wrongs that accrued post-petition,[89] which was just a request for a payment of an administrative expense. Judge Rasure understandably rejected that argument. In the context of the matter then before her, she held that "[r]egardless of the semantics involved,[90] Plaintiffs have indeed asserted claims for distribution from the estate."[91] And she continued, with respect to two of the other bases[92] for finding an adversary proceeding of this nature to constitute a core matter:

> Plaintiffs ask the Court to determine that their claims have administrative priority over other claims against the estate. Again, Plaintiffs invoke the Court's core equitable jurisdiction to hierarchically prioritize their claims against other claims for the purpose of receiving a distribution from the estate, an essential and exclusive obligation of the Bankruptcy Court. *See* 28 U.S.C.

---

85. *Id.* at 122, citing *In re Allen Care Centers, Inc.*, 163 B.R. 180, 181 (Bankr.D.Or.1994), and quoting *O'Neill* (brackets in original).

86. 252 B.R. 516 (Bankr.N.D.Okla.2000) (Rasure, J.) (*"CFS"*).

87. *Id.* at 524.

88. *Id.* at 525.

89. *Id.*

90. The parties there debated whether the post-petition adversary proceeding before the *CFS* court was a "claim," and the *CFS* court held, in the context of the issue then before it, that it was. This Court does not need to decide, and does not decide, whether that

would be true in every context in which a reference to a "claim," defined in section 101(5), might arise in a bankruptcy case; it might not. But in this Court's view, the *CFS* court's conclusions were plainly correct in the context in which they were expressed. And they would be even more plainly correct in the context of "claims against the estate" as used in 28 U.S.C. § 157(b)(2)(B), given the historic origins and purpose of that provision.

91. 252 B.R. at 525.

92. The *CFS* court also held, establishing still another basis for finding the adversary proceeding a core matter here, that "[c]ommencing an adversary proceeding against the debtor *in the bankruptcy court* unquestionably invokes the court's equitable jurisdiction." *Id.* at 525 (emphasis in the original).

§ 157(b)(2)(A) and (O).[93]

For all of these reasons, an adversary proceeding against a debtor to establish a post-petition claim, especially with the priority over other creditors that would be sought in connection with its allowance, presents a core issue.

### C.

■■■ Finally, separate and apart from the issues arising from the Copyright Owners' efforts to share in the Adelphia estate *res,* by pre-petition and post-petition claims, this controversy raises numerous issues of bankruptcy law. Though this Court does not now decide those issues, it notes that the Copyright Owners themselves recognize the need for the bankruptcy issues to be decided,[94] by either this Court or the district court, even while asserting that copyright issues predominate.[95] Assuming, *arguendo,* that bankruptcy defenses, in contrast to claims, might fail to pass muster for "arising under" jurisdiction, where (as here) the claimed infringement resulted from the failure to pay a debt which, at the least, included pre-petition debt that a debtor could not lawfully pay, this Court believes that it meets the requirements for "arising

in" jurisdiction—as the Copyright Owners' claims would not have arisen but for the Adelphia Entities' bankruptcy. And this Court most certainly does not regard this adversary proceeding as a *"Marathon-type"* case.

Without foreclosing either side from raising other issues it might regard as relevant, or purporting to present the only way by which the issues can be articulated, this Court believes that most or all of the following issues (some overlapping with each other, to varying extents, and some implicating issues of nonbankruptcy law, or as to how nonbankruptcy law and bankruptcy law are harmonized) will need to be addressed:

1. To what extent, if any, does federal law—*e.g.,* the Supreme Court's holding in *NextWave,*[96] or the D.C. Circuit decision in *NextWave* that the Supreme Court affirmed,[97]—impose the duty to consider the requirements of bankruptcy law on the construction of other, non-bankruptcy, federal statutes, or to harmonize any conflicting requirements of those statutes?

2. To what extent, if any, does the Supreme Court's holding in *NextWave,*

---

93. *Id.* The Copyright Owners' assertions, as stated in oral argument, that they have not yet explicitly asked this Court to give them administrative priority as well warrant little credence, given their statements in their motion to withdraw the reference and in the Proof of Claim, quoted above.

94. Withdrawal of Reference Mem. 4 ("resolution of the case requires substantial consideration of federal copyright law issues *as well as issues under title 11 of the United States Code . . .*") (emphasis added); *accord id.* at 14 ("there are title 11 considerations. For example, any recovery against the Cable Defendants will be an administrative expense in their chapter 11 proceedings, since, among other things, it arises from postpetition acts").

95. *See id.* It may also be the case that the bulk of the copyright issues are reached only if bankruptcy defenses are rejected.

96. *F.C.C. v. NextWave Personal Communications Inc.,* 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003) (*"NextWave"*).

97. *See NextWave Personal Communications, Inc. v. F.C.C.,* 254 F.3d 130, 133 (D.C.Cir. 2001), *aff'd* 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003) ("Applying the fundamental principle that federal agencies must obey all federal laws, not just those they administer, we conclude that the Commission violated the provision of the Bankruptcy Code that prohibits governmental entities from revoking debtors' licenses solely for failure to pay debts dischargeable in bankruptcy").

after the decisions of the Second Circuit in related but distinct *NextWave* proceedings on a bankruptcy appeal and on mandamus,[98] give renewed vitality to the observations of the *NextWave* bankruptcy court with respect to bankruptcy defenses [99] in its now-vacated decision?

3. When, as a matter of bankruptcy law, under section 101(5) of the Code or otherwise, did the royalty obligation "claim" arise?

4. Was the royalty obligation a single obligation, under bankruptcy law, or a series of separate obligations—*e.g.*, 181 of them?

5. Was the royalty obligation payment due on August 29 a pre-petition debt that the Adelphia Entities could not, under applicable bankruptcy law, lawfully pay?

6. If the answer with respect to Issue # 5 is "yes," is the need to comply with bankruptcy law a defense to a claim for infringement based on the failure to pay?

7. Can the royalty payment be deemed to be a post-petition obligation that the Adelphia Entities could pay without an authorizing court order, when part or all of that obligation had already arisen pre-petition?

8. When, as a matter of bankruptcy law, under section 101(5) of the Code or otherwise, did the Copyright Owners' infringement claims arise? [100]

9. If, by reason of copyright law, the Adelphia Entities retroactively lost their license to retransmit the Copyright Owners' programming, and they lost it with respect to retransmissions in the pre-petition period just as they lost it with respect to the retransmissions in the post-petition period, did the Copyright Owners' infringement claim arise during the pre-petition period, and hence constitute a pre-petition claim?

10. Was the compulsory license, the Adelphia Entities' possessory interest therein, and/or the Adelphia Entities' right to retransmit the Copyright Owners' Programming property of the estate within the meaning of section 541 of the Bankruptcy Code (and non-bankruptcy law relevant to that determination),[101] at

**98.** *See In re NextWave Personal Communications, Inc.*, 200 F.3d 43 (2d Cir.1999); *In re Federal Communications Comm'n*, 217 F.3d 125 (2d Cir.), *cert. denied*, 531 U.S. 1029, 121 S.Ct. 606, 148 L.Ed.2d 518 (2000).

**99.** *In re NextWave Personal Communications, Inc.*, 244 B.R. 253, 264 (Bankr.S.D.N.Y.) (Hardin, J.), *vacated*, 217 F.3d 125 (2d Cir.), *cert. denied*, 531 U.S. 924, 121 S.Ct. 298, 148 L.Ed.2d 240 (2000) ("Since a Chapter 11 debtor is precluded from making postpetition payments on a pre-petition claim, *NextWave's* failure to make payments on the Notes in accordance with a time schedule set by the Notes or by the FCC regulations cannot be deemed a legal default triggering automatic cancellation of the Licenses").

**100.** This differs from Issue # 3 in a way that may or may not be legally significant, in that Issue # 3 relates to the claim for the *royalty* (the issue with which the Adelphia Entities

were faced), and Issue # 5 relates to the *infringement claims* that arose as a consequence of the Adelphia Entities' failure to pay the royalty.

**101.** As the Second Circuit held in *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565 (2d Cir.1991) ("*Prudential Lines*"), the nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. "Whether that interest is included in the property of the debtor's estate is determined by bankruptcy law." *Id.* at 569.

In *In re Magnesium Corp. of America*, 278 B.R. 698, (Bankr.S.D.N.Y.2002) (Gerber, J.) ("*MagCorp*"), this Court held, after discussion of *Prudential Lines* (in which the Second Circuit had held "net operating losses" (NOLs) under federal tax law to be property of the estate), that [i]t is true, at least in this Circuit, that federally created rights can be

the time of the filing of the Adelphia Entities' bankruptcy cases, with the effect that before it could be taken away, authorization had to be sought and obtained from the Bankruptcy Court, at which time this Court could (if otherwise appropriate under the law) have authorized and directed the payment of any post-petition (or even pre-petition) royalty payment necessary to avoid the forfeiture of the license, or damages of many times the amount of the unpaid royalty?

11. Assuming, *arguendo*, that the answer with respect to Issue # 10 is "no," to what extent, if any, did bankruptcy or nonbankruptcy law require the Copyright Owners to make a request for payment of the unpaid royalty as an alleged administrative expense, before seeking allowance of infringement damages, of many times that amount, as an administrative expense for the failure to pay the royalty?

12. Do the Copyright Owners' alleged causes of action meet the standards for allowance of an administrative claim under section 503(b) of the Bankruptcy Code and the caselaw thereunder, most significantly the requirements reiterated by the Second Circuit in *McFarlin's?*

13. Where the retransmissions took place at a time when the Adelphia Entities were authorized to do so, and became unauthorized and allegedly tortious only retroactively and as a consequence of the failure to pay debt, does the alleged infringement qualify as an administrative expense under *Reading v. Brown?*

14. Should the compulsory license established by law under the Copyright Act, 17 U.S.C. § 111, be analyzed as contractual licenses generally (but not always) are,[102] as an executory contract,

---

property of the estate, and it applied that principle to a magnesium refiner's right to Interruptible Service under PURPA and the regulations thereunder. In *In re Ames Dept. Stores, Inc.,* 287 B.R. 112 (Bankr. S.D.N.Y.2002) (Gerber, J.) this Court, after discussion of *Prudential Lines* and *MagCorp,* explained that "[w]hat is property in bankruptcy cases is governed by applicable non-bankruptcy law-usually state law, but sometimes federal law." 287 B.R. at 122–123 (footnotes omitted).

**102.** *See, e.g., In re CFLC, Inc.,* 89 F.3d 673, 677 (9th Cir.1996) (patent license was an executory contract); *In re Golden Books Family Entertainment, Inc.,* 269 B.R. 300, 308–309, and 269 B.R. 311, 313–314 (Bankr.D.Del. 2001) (McKelvie, D.J., sitting as a bankruptcy judge) (copyright licenses were executory contracts); *In re Novon International, Inc.,* 2000 WL 432848 (W.D.N.Y.2000) (Elfvin, J.) (patent license was executory contract); *In re HQ Global Holdings, Inc.,* 290 B.R. 507, 509–510 (Bankr.D.Del.2003) (Walrath, J.) (trademark and trade name licenses were executory contracts); *In re Kmart Corp.,* 290 B.R. 614, 617–619 (Bankr.N.D.Ill.2003) (Sonderby, J.)

(software license agreements were executory contracts); *Univ. of Connecticut Research & Development Corp. v. Germain (In re Biopolymers, Inc.),* 136 B.R. 28, 29–30 (Bankr. D.Conn.1992) (Krechevsky, C.J.) (patent license was executory contract); *In re Chipwich, Inc.,* 54 B.R. 427, 429 (Bankr.S.D.N.Y. 1985) (Schwartzberg, J.) (trademark licenses were executory contracts).

Typically that result is reached after consideration of the traditional "Countryman test," as it was in all of the above cases. In *Novon International,* Judge Elfvin summarized the rationale for many of these holdings:

Generally speaking, a license agreement is an executory contract as such is contemplated in the Bankruptcy Code. ... This is so because each party remains obligated under the agreement—the licensor not to sue for infringement and the licensee to use the patent in accordance with the terms of the agreement.

2000 WL 432848 at *4 (citations, including one to *CFLC,* omitted). "Licensing agreements are not, however, universally considered executory contracts," *In re Qintex En-*

under section 365 of the Bankruptcy Code?

15. If the answer with respect to Issue # 14 is "yes," should the normal consequences of executory contract analysis, under section 365 of the Code, follow from that—that the Adelphia Entities should be authorized and directed forthwith to pay any post-petition component of the royalty; the Adelphia Entities would have to decide whether to assume or reject the compulsory license; rights under the compulsory license would not be forfeited unless and until they were prospectively forfeited after rejection of the compulsory license; the Copyright Owners would have an allowed claim for the pre-petition component of the royalty if the compulsory license is rejected; the Adelphia Entities would have to pay the pre-petition component if the compulsory license is assumed; and the Copyright Owners would have the right to move to require the Adelphia Entities to assume or reject the compulsory license before confirmation?

16. If the answer with respect to Issue # 14 is "yes," should the pro-rating of the pre- and post-petition obligations be based on the number of days in the pre- and post-petition periods; or on the number and type of retransmissions in each period that gave rise to the royalty obligation; or on the incremental amount payable for the royalty by reason of post-petition retransmissions; or by some other means or formula?

17. If, as may be the case, the Adelphia Entities have post-petition obligations to indemnify some or all of the officers and directors who were named as defendants and may be subjected to copyright infringement liability, as a consequence of the Adelphia Entities' breach of an obligation to pay a monetary obligation that was in part or in whole pre-petition debt, to what extent, if any, does that subject the Adelphia estate for "back-door" exposure to administrative expenses that would not otherwise be recoverable as administrative expenses under section 503(b) of the Bankruptcy Code?

As is apparent from the foregoing, this adversary proceeding is replete with issues of bankruptcy law, all or substantially all of which would not have arisen outside of the Adelphia Entities' bankruptcy, and which "would have no practical existence but for the bankruptcy." These trigger "arising in" jurisdiction, and make this a core matter for that reason as well.

## D.

The Court has also reviewed with considerable care the principal cases cited by the Copyright Owners [103] (many mentioned

---

tertainment, Inc., 950 F.2d 1492, 1495 (9th Cir.1991), and are usually examined in the context of their particular rights and obligations, as would be required in an application of the Countryman test.

103. Orion; McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.), 160 B.R. 502 (S.D.N.Y. 1993) (Ward, J.); In re Aarismaa, 233 B.R. 233 (N.D.N.Y.1999) (McAvoy, J., approving report of Gerling, J., which is the bulk of the decision), aff'd, 182 F.3d 898 (2d Cir.1999); Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C, 1999 WL 179749 (E.D.Pa.

1999) (Kauffman, J.); Tenet Healthcare Corp. v. Williams (In re Allegheny Health, Educ. & Research Found.), 233 B.R. 671 (Bankr. W.D.Pa.1999) (McCullough, J.); Maaco Enterprises, Inc. v. Corrao, 1991 WL 255132 (E.D.Pa.1991) (Waldman, J.); Burger King Corp. v. B–K of Kansas, Inc., 64 B.R. 728 (D.Kan.1986) (Saffels, J.); Christensen v. St. Paul Bank for Cooperatives (In re Fulda Independent Co-op.), 130 B.R. 967 (Bankr.D.Minn. 1991) (Kishel, J.); Frelin v. Oakwood Homes Corp., 292 B.R. 369 (Bankr.E.D.Ark.2003) (Evans, J.); Rivera v. 610 W. 142 Owners Corp., 219 B.R. 363 (Bankr.S.D.N.Y.1998)

for the first time only at oral argument), in support of their contention that this adversary proceeding is non-core. None, in this Court's view, warrants conclusions different from those set forth above.

*Orion* was a suit *by* the estate, and not against it, to increase the size of the estate and not to share in it, and raised what the Second Circuit later described as classic *Marathon*-type issues—suit on pre-petition contract claims.[104] There is no indication that the *Orion* defendant had filed a proof of claim, and it was not necessary to consider bankruptcy issues to decide the case. In its later decision in *Best Products,* the Second Circuit distinguished *Orion* on the basis that it was a *Marathon*-type action,[105] and went on to say:

> The only relationship the [*Orion*] action had to the bankruptcy proceeding was that determination of the action would affect the ultimate size of the estate. Unlike a proceeding that simply seeks to augment the estate, the present proceeding involves the priority rights of creditors who have filed claims against the estate.[106]

*McCrory,* a Lanham Act action brought by debtor-plaintiff McCrory, was an action *by* the debtor, and not against it. It did not reflect an effort by a claimant to share in the assets of the estate. No bankruptcy issues were before the court. And there is no indication of the filing by the defendant of a proof of claim in McCrory's chapter 11 case.

One of the two adversary proceedings brought in *Aarismaa* was alleged copyright infringement, but in every other respect, *Aarismaa* was wholly unlike the matter here. The adversary proceedings, *pro se* cases brought by a chapter 13 debtor who had been twice enjoined by a federal district judge from bringing further litigation without prior permission,[107] were brought *by* the debtor, and not against him. They involved pre-petition contract and copyright infringement claims, with the effect, at most, of increasing the size of the estate, and represented classic *Marathon*-type claims. They did not involve issues of bankruptcy law, and there is no indication that the defendants in those adversary proceedings had ever filed a proof of claim.

In *Maaco Enterprises,* raised only at oral argument (an action in which the plaintiff Maaco had sought an injunction for pre-petition trademark infringement), there was no damages claim against the chapter 11 debtor,[108] and there is no indication that Maaco had filed a proof of claim or otherwise tried to share in assets of the estate. Nor was there present any bankruptcy issue in that case.

In *Times Mirror Magazines,* another pre-petition trademark infringement case, there is likewise no indication of any claim or other effort to share in the assets of the estate, and there were no bankruptcy issues before the court.

This court is at something of a loss to see the relevance of *Burger King,* also first

---

(Gallet, J.); *Bevilacqua v. Bevilacqua,* 208 B.R. 11 (E.D.N.Y.1997) (Weinstein, J.).

**104.** *See Best Products,* 68 F.3d at 32.

**105.** *Id.* ("*Orion Pictures* involved a breach of contract action *by a debtor* against a party to a pre-petition contract *that had not filed a proof of claim with the bankruptcy court,* exactly the situation in *Marathon*") (italics add-

ed). This case is exactly the opposite of *Orion,* in each of the two italicized respects.

**106.** *Id.*

**107.** 233 B.R. at 238, 240.

**108.** *See* 1991 WL 255132 at *2 ("Maaco seeks injunctive relief rather than money damages . . .").

raised in oral argument, in this case. While this Court can see how *Burger King*, in which Burger King brought a trademark infringement adversary proceeding against a debtor franchisee, might be relevant in the withdrawal of the reference debate before the district court,[109] *Burger King* did not rule on whether the claims there presented were core or noncore. Indeed, the *Burger King* court stated that "[e]ven assuming arguendo that every claim in this case is a 'core' proceeding, nothing in section 157 prevents this court from withdrawing its reference of the case."[110]

Likewise, the basis for citation of *Christensen*, also first raised in oral argument, is inexplicable. Contrary to statements by the Copyright Owners at oral argument,[111] that adversary proceeding did not involve claims against (or even by) the debtor Fulda Co-op; it was a suit brought by injured farmers, some or all of whom were creditors of the debtor Co-op, against *another creditor* of the Co-op, St. Paul Bank for Cooperatives—a bank that, prior to the filing of a chapter 7 case by the debtor Co-op, had allegedly seized and wrongfully converted property of the farmers which had been stored with the debtor.[112]

*Allegheny Health* is of the same type. It was not a suit against or even by a debtor, but rather had been brought by purchasers of the debtors' property against other third-parties, who had allegedly infringed the plaintiff-purchasers' rights in the intellectual property that the plaintiffs had earlier bought from the estate.[113]

*Rivera,* also first raised in oral argument, likewise has no relevance here. In *Rivera,* Judge Gallet of this Court understandably rejected the notion that bringing money *into* an estate (as a *Marathon*-type action, with a debtor as plaintiff, tries to do) would be a core matter, based on the fact, even if true, that without it, there would be insufficient assets to provide a recovery for unsecured creditors.[114] He did not address an effort to share in the *res* consisting of property of the estate, which is what this Court has before it here. And other aspects of Judge Gallet's decision actually support the Adelphia Entities' position here. After describing the motion then before him—one by a *non-debtor defendant* for a determination that "the proceedings, *as they relate to her,*" are not core[115]—Judge Gallet noted that "[t]he other ... Defendants have conceded that this proceeding, as it relates to each of them, is core under 28 U.S.C. § 157(b)(2)(C) because they filed proofs of claim against the estate arising out of the same transaction that forms the basis of these adversary proceedings."[116]

*Frelin v. Oakwood Homes Corp.,* another case raised for the first time in oral argument, did involve a suit against chapter 11 debtors (involving pre-petition claims), but there is no indication that the plaintiffs in that case had filed proofs of claim. Certain *co-defendants* sued with

---

**109.** *Burger King* was a *withdrawal of the reference* case, *see* 64 B.R. at 733, and found mandatory withdrawal to be appropriate, based on the presence of both non-bankruptcy and bankruptcy issues. Whether that is likewise appropriate here is a matter for the district court.

**110.** 64 B.R. at 732.

**111.** *See* Arg. Tr. 25.

**112.** *See* 130 B.R. at 970–971.

**113.** *See* 233 B.R. at 678.

**114.** 219 B.R. at 372.

**115.** *Id.* at 366.

**116.** *Id.* at 367–368.

the debtors had filed proofs of claim, for contribution, but they did not raise the same issues, and in any event the *plaintiffs* had not thereby submitted to the jurisdiction of the bankruptcy case.

Of all of them, *Bevilacqua v. Bevilacqua,* another case raised for the first time in oral argument, is the only one with arguable relevance here. There, after two years of state court litigation (by a mother-in-law seeking ejectment of her daughter-in-law from a home that was willed to the former by her husband, and related damages), the defendant daughter-in-law filed a chapter 7 petition, and removed the state court action to the district court. Judge Weinstein understandably abstained, and understandably remanded to the state court, based in part on the fact that a proof of claim had not been filed.[117] But in that case (which does not appear to have been well-lawyered), Judge Weinstein expressed some views unnecessary to his conclusion, with which this Court (while agreeing with the ultimate result) would differ: that ["i]t does not involve the 'allowance or disallowance of claims against the estate' in the sense that it will determine whether plaintiff has a claim against the estate," and that "[w]ere plaintiff to be awarded damages in its suit and then file a proof of claim in bankruptcy court to recover such damages, *that* proceeding would be core pursuant to section 157(b)(2)(B) . . . ."[118]

Respectfully, this Court would not agree with those observations concerning § 157(b)(2)(B). If (as is near certain; as is the obvious point of commencing or continuing litigation against a debtor elsewhere; and as the Copyright Owners have stated is their intention here [119]) any plaintiff would take the determination in the non-bankruptcy court action and then invoke collateral estoppel or res judicata to establish its claim in the bankruptcy court, the non-bankruptcy court action plainly *would* "determine whether plaintiff has a claim against the estate," or go very far in that direction. A bankruptcy court might well elect, in its discretion, to allow a claim to be liquidated somewhere else,[120] especially if (as was the case in *Bevilacqua*) litigation had been going on for a long time in the other forum and no substantive bankruptcy issues needed to be decided. But here there are many bankruptcy issues that need to be decided, and in any event, the Copyright Owners *have* filed proofs of claim in the Bankruptcy Court. Those facts distinguish this case, and thus the *Bevilacqua* analysis would not change the result here even if correct.

### Conclusion

For the foregoing reasons, the Court concludes that all of the issues in this adversary proceeding are "core." The Adelphia Entities' motion for a declaration that the issues are core is granted, and this Court reports its conclusions to the district court as set forth above.

SO ORDERED.

---

117. *See* 208 B.R. at 16.

118. *Id.* (emphasis in original).

119. *See* Arg. Tr. at 48–49 ("Well, we believe that if we try this case in the district court and we have damages and we come back to this Court ... and seek allowance of an administrative claim, that your Honor will hold that the other case was res judicata with respect to the claim allowance issue").

120. *See In re Sonnax Industries,* 907 F.2d 1280, 1286 (2d Cir.1990) (setting forth factors for bankruptcy courts to consider when asked to grant relief from the stay to permit litigation to proceed elsewhere).