**In re AMES DEPARTMENT STORES, INC., et al., Debtor.**

**NWL Holdings, Inc., Plaintiff,**

**v.**

**Eden Center, Inc., Defendant.**

**Bankruptcy No. 01–42217 (REG).**
**Adversary No. 04–3072.**

United States Bankruptcy Court,
S.D. New York.

Aug. 27, 2004.

Kasowitz, Benson, Torres & Friedman, by David S. Rosner, (argued), Howard W. Schub, (argued), Alan Lungen, Ronna G. Jackson, New York, NY, for NWL Holdings.

Wiley, Rein & Fielding LLP, by Jason Gold, (argued), Todd A. Bromberg, (argued), Washington, D.C., Lawson & Frank, by Alan B. Frank, Arlington, VA, for Eden Center.

Weil, Gotshal & Manges LLP, by Timothy Q. Karcher, New York, NY, for Ames Department Stores.

White & Case, by Frank L. Eaton, Miami, FL, for Stop & Shop Company.

Otterbourg, Steindler, Houston & Rosen, P.C., by Rosanne A. Finkel, New York, NY, for Official Committee of Unsecured Creditors of Debtors Ames Department Stores, Inc., et al.

### DECISION ON MOTION FOR PRELIMINARY INJUNCTION

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the jointly administered chap-

ter 11 cases of Ames Department Stores, Inc. and its affiliates ("Ames," or the "Debtors"), plaintiff NWL Holdings, Inc. ("NWL") moves, under Bankruptcy Code section 105(a), Fed.R.B.P. 7001 and 7065, and Fed.R.Civ.P. 65(a), for a preliminary injunction—which, while broadly formulated, has at its heart a request that this Court enforce its earlier orders (including one entered on consent), and that the Court enjoin defendant Eden Center, Inc. ("Eden Center") from going to Virginia state court to evict NWL from the leasehold NWL purchased from Ames on claims of alleged breaches of the lease that were authorized under this Court's orders.

Eden Center opposes the motion, and raises the threshold issue of this Court's subject matter jurisdiction to entertain this controversy.

After an evidentiary hearing, briefing and argument, and due consideration,[1] the Court determines that it plainly has subject matter jurisdiction, and that contentions to the contrary are wholly without merit. It further determines that NWL has shown not just serious issues going to the merits, but a likelihood of success, with respect to NWL's claims that Eden Center's claims of breach have been pretextual and have had both the purpose and effect of thwarting this Court's earlier orders. As the Court also finds irreparable injury, a preliminary injunction will be granted, though not in the form NWL requested. There follow the Court's Findings of Fact and Conclusions of Law with respect to the motion.

## Facts

Many of the facts relevant to this motion are undisputed. But important to determination of the motion are those relating to the motivation of the defendant Eden Center, and its principal, Norman Ebenstein, with respect to alleged efforts to thwart Ames' assumption and assignment of its leasehold, and to frustrate the earlier orders of this Court. The Court accordingly considered it critical to gauge Mr. Ebenstein's credibility after hearing his live testimony, and it has done so. After having heard and viewed Mr. Ebenstein's testimony, and having assessed his credibility, the Court finds Mr. Ebenstein's explanations to be unworthy of belief; finds his claims of breach and injury to be no more than pretext; and finds that he did, indeed, seek to undermine this Court's earlier orders, with the purposes of depriving NWL of the assignment this Court authorized and capturing the leasehold and its value for Eden Center's own purposes.

## The Court's Earlier Orders

Until it became clear, in the course of its chapter 11 case, that Ames could not successfully reorganize as an ongoing business and would have to liquidate, Ames was a discount retailer, operating hundreds of stores in leased premises. Its store leases—a large number of which were executed years ago, in environments of lower rental rates—in many cases had substantial value, and an important aspect of the Ames chapter 11 case has been its efforts to derive value from its store leases, particularly by "assume and assign" transactions, following the sale of leases or of the rights to designate leases for that purpose.[2]

In December 2002, the Debtors filed a motion for an order approving the sale of

---

1. The Court previously entered a temporary restraining order, after notice and a hearing, and continued the temporary restraining order through its determination on this motion.

2. See *In re Ames Department Stores, Inc.,* 287 B.R. 112 (Bankr.S.D.N.Y.2002) (Gerber, J.) for a discussion of the lease marketing process and for an explanation of how designation rights transactions work.

designation rights to the Stop & Shop Supermarket Company ("Stop & Shop"),[3] contemplating the subsequent assumption and assignment and sale of the leases to Stop & Shop or its designees. On December 18, that motion was approved. The approval order, dated December 18, 2002 (the "Designation Rights Order")[4] authorized Stop & Shop's designees—who would be the assignees of Ames' leasehold rights as lessee, following "assume and assign" transactions with respect to each assigned lease—to alter or remodel the leased premises. The Designation Rights Order provided, among other things:

> [N]otwithstanding any provision in any Lease, Seller Party REA, or local law to the contrary, any Designee may perform alterations and remodeling to the extent necessary to operate its retail operations at the Leased Premises and to replace and modify existing signage. . . .

It further provided, in relevant part:

> [T]he Court retains jurisdiction to interpret and enforce the terms of this Order and the Designation Rights Agreement, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to, or affecting, any of the transactions contemplated by the Designation Rights Agreement, including without limitation, the assumption, assignment and transfer of the Leases to Designees. . . .

*The Present Controversy*

Eden is the successor to the landlord interest in a retail store Ames had operated in Falls Church, Virginia (the "Falls Church Store") under a lease initially be-

tween an Ames affiliate and Eden's predecessor, Capital Commercial Properties. That lease, originally executed in 1967, was for a rental rate that, with the passage of time, became extremely attractive for the tenant and correspondingly unattractive for the landlord. As a result, the Falls Church Store lease (like a fair number of other Ames leases) came to have considerable economic value for the Ames estate, which could be converted into value for Ames' creditor constituency generally.

In accordance with the Designation Rights Order, Ames delivered a notice to Eden announcing its intention to assume and assign the Falls Church Store lease to NWL, which is a subsidiary of National Wholesale Liquidators, Inc. Eden objected to the assignment, but ultimately the controversy with respect to the assignment was consensually resolved. Following a hearing on the matter, the Court approved a consent order (the "Assignment Order") authorizing the assumption and assignment of the Falls Church Store lease to NWL. The Assignment Order provided, *inter alia,* that:

> [T]he proposed use of the premises governed by the Lease shall be for a National Wholesale Liquidators department store and/or for any other purpose not prohibited by the Lease and any provision in the Lease that purports to restrict the Assumption and Assignment of the Lease to NWL for the construction and operation of a National Wholesale Liquidators department store and/or any other purpose not prohibited by the Lease shall be unenforceable. . . . [5]

---

3. Main Case ECF # 1479.

4. Main Case ECF # 1611.

5. Assignment Order at 4 (Main Case ECF # 2578). The Court does not need to decide

whether it would have included a decretal provision of that generality and breadth if there had been an objection to it; here, as noted, it was agreed to by Eden Center, and entered on consent.

And it further provided, in relevant part, that:

> [The] Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Order, the Designation Rights Order, and the Assumption and Assignment of the [Falls Church Store] Lease.

However, even though the Designation Rights Order expressly permitted NWL to make alterations and to remodel the Falls Church Store, counsel for Eden issued a default notice with respect to the Falls Church Store lease, contending that NWL was making unauthorized alterations to the Falls Church Property, allegedly diminishing its value, as the first step toward terminating the Falls Church Store lease and bringing NWL's occupancy of the Falls Church Store to an end.

Contending that the asserted lease violations were violative of the Assignment Order and the Designation Rights Order, NWL commenced this adversary proceeding, and made an emergency motion for a temporary restraining order and preliminary injunction, seeking to enforce this Court's earlier orders and to enjoin steps to terminate its tenancy. This Court granted the requested TRO (though in a narrower form than requested), and scheduled an evidentiary hearing on the preliminary injunction motion.

*Factual Findings After the Evidentiary Hearing*

At the evidentiary hearing, the Court took evidence on the nature of the altera-
tions complained of, and on Eden Center's motivation for raising the objections it did.[6] On April 15, 2004, Eden Center, by counsel, wrote NWL, noting that NWL had removed the suspended ceiling grid, ceiling tiles and lighting from the Falls Church Store, contending that "[e]ach of the alterations has diminished the value of the Demised Premises."[7] It further contended that NWL had violated Paragraph 9A of the Lease, which generally provided that repairs, alterations or other improvements had to be done in a good and workmanlike manner and in conformity with all laws, so that the premises would not be diminished in value thereby.[8] Eden Center demanded that NWL cure the alleged default by reinstalling the ceiling grid, ceiling tiles and lighting within the cure period, which would expire on May 15. It further stated that if NWL failed to do so, the landlord would be entitled to exercise remedies under the lease, including lease termination.[9] At some point before May 14, Eden Center advised NWL and this Court that it wished to proceed in Virginia state court to assert its alleged rights to terminate the lease.

After Eden Center declined to enter into a voluntary standstill to await determinations by this Court vis-à-vis the issues that are the subject of this motion, NWL sought a temporary restraining order with respect to efforts to terminate its leasehold. This Court heard the TRO application, on notice, and on the record,[10] on May 14, the day before the cure period would

---

6. In accordance with this Court's Case Management Order # 2 (Main Case ECF # 1954), direct testimony was introduced by affidavit, and cross-examination and subsequent examination proceeded live, with the exception of the testimony of Mr. Ebenstein, who was called and examined as an adverse witness; the entirety of his testimony was taken live.

7. NWL Exh. E.

8. *Id.* (quoting Lease at ¶ 9(A)).

9. *Id.*

10. *See* Tr. of Hrg. on TRO Application, May 14, 2004 ("TRO Hrg. Tr.").

expire. The Court granted the requested TRO [11] (though in a form narrower than that proposed by NWL),[12] and provided in its TRO that NWL's time to cure the alleged default would be tolled pending Court determination of whether or not there was, indeed, a default, in a manner akin to a *"Yellowstone* injunction" [13] in New York practice.[14]

Based on the testimony the Court heard at the evidentiary hearing, the Court finds that Eden Center's expressed concerns were specious. It finds that taking down the ceiling grid and ceiling tiles was justified, and in any event, expressly authorized under the Court's earlier orders; that new lighting was put up in the old lighting's place; and that the premises were not, in fact, diminished in value.

The Court further finds that after this Court's approval of the assignment of the Falls Church Store lease to NWL, NWL considered the renovations it deemed to be appropriate to operate an NWL store at the leased premises for the remaining 12 years of the lease term, and that based on the condition of the ceiling, NWL determined that it wished to remove the suspended ceiling grid, ceiling tiles and lighting, and to install new lighting. The Court accepts, and finds credible, NWL's testimony that the ceiling was materially damaged before NWL's removal of the ceiling grid and tiles; [15] indeed, Eden had made a claim against the Ames estate with respect to the condition of the ceiling, and obtained a cure payment from Ames for repair costs covering that claim (and other asserted damage).[16] However, the Court also finds

11. While it granted a TRO, the Court did not grant the TRO in the broader form in which it was proposed by NWL, and went through that proposed order with the parties, paragraph by paragraph, stating the ways in which the TRO would, or would not, be narrowed. *See* TRO Hrg. Tr. at 78–79, 82–83. The Court thereafter so-ordered the record, *id.* at 88, and later issued a stand-alone TRO, dated May 14, 2004 (Adversary ECF # 4), consistent with the Court's rulings.

> In this connection, the Court also considered Eden Center's contentions that the Court lacked subject matter jurisdiction over the controversy and thus could not issue a TRO. However, the Court ruled that it did indeed have subject matter jurisdiction, for reasons it then set forth on the record. *See* TRO Hrg. Tr. at 69–71. The Court stated, in this connection:
>
> I'm going to get back to [the TRO] standards in a minute, but I first need to discuss the subject matter jurisdiction that I have with respect to this because it raises a threshold issue. Upon my own review, I have become comfortable, I am very confident[,] that I do have subject matter jurisdiction to issue this TRO. But when we get to the matter of the preliminary injunction, I will nevertheless give the landlord, Eden, the right to be heard once again in full and upon *ab initio* review, my subject matter jurisdiction.

*Id.* at 68–69 (transcription error corrected).

12. *Id.* at 63, 75–79.

13. *See First Natl. Stores v. Yellowstone Shopping Ctr.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968) (*"Yellowstone"*).

14. *See, e.g., S & B Petroleum, Inc. v. Gizem Realty Corp.*, 8 A.D.3d 550, 778 N.Y.S.2d 696 (2d Dep't 2004).

> The Supreme Court properly denied the defendants' cross motion to terminate the lease and evict S & B Petroleum, Inc., from the subject premises, finding that the defendants' grounds for the termination were the same unresolved issues to be determined at trial. Moreover, a *Yellowstone* injunction was issued on June 5, 2002, and in light of the conflicting allegations regarding the parties' purported breaches of the lease, "an injunction is necessary to preserve the status quo until a trial can be conducted on the merits . . .".

*Id.* (citations, including citation to *Yellowstone,* omitted).

15. *See, e.g.,* Kwiatkowski Direct ¶ 10; Sciarrino Direct ¶¶ 5,6,7,8; Lynch Direct ¶ 4, Lynch Cross at 63.

16. Eden Center then stated:

that NWL preferred to operate premises without suspended ceiling grids and tiles, as it perceived those to be more consistent with the "warehouse look" that NWL prefers for its stores. The taking down of the damaged ceiling grid and ceiling tiles was done for an amalgam of those two reasons.

The Court does not need to make a finding, however, as to whether NWL's preference for the warehouse look was a more important factor in its determination to remove the ceiling grid and tiles than its need to remedy the ceiling damage, since the repair of the damage was necessary, and changes were authorized under this Court's order authorizing NWL to "perform alterations and remodeling to the extent necessary to operate its retail operations at the Leased Premises." The then-existing damage to the ceiling was a sufficient reason for the action,[17] and the Court does not have to decide whether NWL's preference for a "warehouse look," in the absence of a need to address the preexisting condition, would be sufficient by itself to invoke the authority granted under the Court's order.

The Court does not go so far as to find, as NWL argued, that the value of the premises was materially *increased* by the modifications NWL made (which cost NWL approximately $100,000),[18] but the Court does agree, and finds, that more than minimal action was necessary to deal with the ceiling in the condition in which NWL took the leasehold, and that the value of the leased premises was not diminished by those changes, especially in any material respect. In any event, alterations and remodeling of the character NWL undertook were, as noted, authorized under the Designation Rights Order.

In short, Eden Center declared a default based on conduct expressly authorized under the Designation Rights Order, which had authorized the renovations "notwithstanding any provision in any Lease, Seller Party REA, or local law to the contrary...."

*Eden Center's Motivation and Conduct*

The Court further finds that Eden Center, acting through Mr. Ebenstein, raised the issue of the renovations as a pretext to try to recover the Falls Church Store, notwithstanding the Court's earlier orders, to facilitate Eden Center's economic interests, and to facilitate Mr. Ebenstein's al-

---

In addition, *the water damage necessitates the removal of the ceiling tiles,* the gypsum board and the composite floor tiles. There are additional repairs necessary to return the premises to the good operating condition required under the lease. As a consequence of Debtors' inattention to its maintenance obligations under the Eden lease, Eden has incurred additional damages to its premises which it estimates will cost an additional $569,257 to repair, inclusive of replacement of the roof.

NWL Exh. C at ¶ 9 (emphasis added).

17. After Mr. Lynch testified on cross-examination that the ceiling was "in bad condition," and that it seemed appropriate to him to remove it (Lynch Cross at 63), he was asked "whether or not it could be repaired," to which he admitted that he did not know, and he admitted that he was "not in the

ceiling repair business." *Id.* Those answers do not change the Court's factual determinations. It is plain to this Court that the decision to proceed as NWL did was a reasonable one, and in good faith. Given the authority granted under the Court's earlier order, the Court considers it wholly inappropriate for Eden Center to be trying to evade it, and thereby to evict NWL, based on second guessing as to whether the ceiling also could have been repaired. The Court further notes, in this connection, that Eden Center introduced no proof that such was a satisfactory alternative.

18. The Court understands this figure to relate to the portion of NWL's total renovation costs attributable to the ceiling and new lighting. The total renovation costs were approximately $650,000. *See* Sciarrino Aff. ¶ 11.

ternate plan for the property, to develop it as a "mini-mall" for merchants in the Vietnamese–American community. Doing so, Eden Center could secure rentals of approximately $50 per square foot (per annum); rentals for a single user would run $10 to $13. Given the approximately 77,000 square feet in the Falls Church Store, that would result, as Mr. Ebenstein admitted in his deposition, in a "gargantuan difference." [19] Given that, along with Mr. Ebenstein's demeanor and other answers, the Court is constrained to disbelieve Mr. Ebenstein's denials of a desire to "get NWL out of the premises." [20] Rather, as Mr. Ebenstein admitted on cross-examination, what he really wants for Eden Center is to terminate the Eden Center lease now, "for whatever reason," and to seek to re-let it.[21]

These matters reinforce the Court's conclusion that Eden Center's reliance on a claimed default as a consequence of the ceiling renovations is mere pretext.

*Other Eden Center Efforts to Gain Control of the Falls Church Store*

Other matters—apart from the testimony of Mr. Ebenstein—reinforce this Court's finding that the issues Eden Center has now raised are simply a pretext, for the purpose of regaining control of the Falls Church Store or obtaining a higher rent for it. Earlier in this case, while Ames was still in possession of the Falls Church Store, Eden Center sought a determination in state court (though the controversy was later removed to this Court) that Ames had not properly exercised its options to renew its lease of the Falls Church Store, assertedly because Ames' option exercise letters had been executed on behalf of the wrong Ames entity—in essence, that they had been executed on the wrong letterhead, or with the wrong signature line.[22] The letters had been written with a signature line of "Ames Department Stores, Inc.," when in fact, the

**19.** Ebenstein Adverse Direct at 91.

**20.** *Id.* at 97–98.

**21.** As this questioning went:

Q:  Isn't it true, Mr. Ebenstein, that what you want for Eden Center really, is to terminate this lease now for whatever reason and seek to re-let it?
A.  Today?
Q.  Today.
A.  Yes.

Ebenstein Adverse Direct at 99.

**22.** On May 1, 2001, Mr. Ebenstein wrote:

We have recently had occasion to review our leases and correspondence dealing with all our Ames stores and more particularly Shirley Highway (your store # 2570).

A review of our documents indicates that in 1992, Ames Department Stores, Inc. assigned the Shirley Highway lease and other leases with our company, to Ames Realty II, Inc.

Thereafter, Mr. Hlis, as Vice President for Ames Department Stores, Inc., attempted to exercise options to extend the leases. Giv-

en the fact that Ames Department Stores, Inc. had no residual rights, and no options to extend were ever exercised by Ames Realty II, Inc., for any stores. [sic] Ames Realty II has been occupying the stores as a holdover tenant since the expiration of the last term of each lease.

Given our longstanding relationship, I am taking this opportunity to write to you and advise you as to the status of these premises, rather than immediately exercising our rights under the leases and because of a 40-year relationship with Ames and its predecessor we do not wish to cause Ames a multitude of problems. It may well be that landlords in other Ames locations may not yet have recognized the deficiencies. However, for our purposes, it is essential that a meeting be immediately arranged to either enter into new leases, or to coordinate vacation of the subject stores.

*See Capital Commercial Properties, Inc. v. Ames Realty II, Inc. (In re Ames Department Stores, Inc.),* 288 B.R. 339, 346 (Bankr. S.D.N.Y.2003), *aff'd* 302 B.R. 791 (S.D.N.Y. 2003) (Lynch, J.), *summarily affirmed,* No. 03–5049 (2d Cir. Oct. 22, 2003).

tenant of record was a different Ames entity, "Ames Realty II, Inc." Eden pursued its effort to thwart the renewal of the lease, and to recapture the premises, all the way up to the Second Circuit.[23] The district court affirmed this Court's decision granting summary judgment in Ames' favor. Eden Center's appeal to the Second Circuit from that determination was dismissed by the Circuit, and the district court decision was thereby summarily affirmed, under rules applicable to appeals lacking an arguable basis in law and in fact.[24]

Then, it appears that Eden Center is also seeking to evict NWL from the Falls Church Store for a nonpayment of rent that has already been paid. NWL paid the April rent late and the May rent early.[25] In May 2004, NWL discovered that it had failed to pay the April rent, and NWL paid it on May 14.[26] But after May 14,[27] seizing on the interval of time during which the rent had not been paid (and at least seemingly ignoring requirements in its lease documents for notice and opportunity to cure alleged defaults),[28] Eden Center brought another proceeding, in Virginia, seeking to evict NWL from the Falls Church Store, based on the nonpayment of rent that had already been paid.

Once more this reinforces the Court's conclusions that Eden Center has been seeking, by one device after another, to recapture the Falls Church Store for its own purposes, and to frustrate this Court's orders authorizing the assumption and assignment of the Falls Church Store lease, which had the purpose and effect of making the value in the Falls Church Store lease available for the benefit of *all* of Ames' creditors, and not just its landlord.

## Discussion

### I.

■ Eden Center preliminarily argues that this Court lacks subject matter jurisdiction to immerse itself in Eden Center's controversy with NWL. Considering that matter first,[29] the Court flatly disagrees.

The subject matter of the district court (and hence this Court) to entertain a controversy of this character rests on section 1334 of the Judicial Code, 28 U.S.C. § 1334.[30] This Court discussed the three prongs of § 1334's jurisdictional grant in

23. *Id.*

24. *See* Second Circuit Order of October 22, 2003: "Defendants–Appellees ... move for summary affirmance. Upon due consideration, it is ORDERED that the motion is granted and the appeal is dismissed because it lacks an arguable basis in law or in fact.".

25. Ebenstein Adverse Direct at 115.

26. NWL Exh. N.

27. Ebenstein Adv. Direct at 119.

28. NWL Exh. M at ¶ 13A.

29. The Court considers that as a threshold issue. *See, e.g., In re Millenium Seacarriers, Inc.,* 2004 WL 63501 at *4 (S.D.N.Y.2004) (Patterson, J.) (*"Millenium Seacarriers"*)

("When a court's jurisdiction is challenged, the court has an obligation to resolve that issue before proceeding to the other issues in a proceeding.").

30. After providing, in its subsection (a), that the district courts have jurisdiction (and, indeed, exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here), 28 U.S.C. 1334 provides, with respect to *proceedings* (which include, in addition to contested matters in cases, adversary proceedings like this one):

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

its earlier decisions in *Sterling Optical*[31] and *Adelphia*,[32] and will not repeat them at comparable length here. It is sufficient for the purposes of this analysis to note that § 1334 confers subject matter jurisdiction where the claims arise under the Code, arise in proceedings under the Code, or are related to cases under the Code. As a result, the three types of jurisdiction that district (and hence bankruptcy) courts may exercise under § 1334 are colloquially referred to as "arising under," "arising in," and "related to" jurisdiction.

Eden Center premises its argument on the truism that at this juncture, with Ames having already effected its assignment, the outcome of this controversy will not have an economic or other effect on the Ames estate, as has traditionally been required in this Circuit and elsewhere, to invoke "related to" jurisdiction.[33] But Eden Center fails satisfactorily to recognize that subject matter jurisdiction here is not based on "related to" jurisdiction. Rather, it exists by reason of "arising in" jurisdiction, by reason of the Court's earlier orders in this case (which, without dispute, were entered in connection with a core function), and the need to enforce them.

As noted in *Adelphia*,[34] cases in this district have stated that a claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy case because it has no existence outside of bankruptcy.[35] Other decisions (including two at the court of appeals level) have stated it more broadly—that a proceeding "arises in" a bankruptcy case when it would have no practical existence but for the bankruptcy.[36] Efforts to implement, gain the fruits of, and to enforce orders of the bankruptcy court are all in this category. Discussions of "related to" jurisdiction, a wholly separate jurisdictional basis, are irrelevant to an "arising in" jurisdiction inquiry.

There can be no serious debate of this Court's subject matter jurisdiction in light of the earlier rulings in this Circuit and District in *In re Petrie Retail*[37] and *Millenium Seacarriers*,[38] each of which is closely on point.

31. *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 302 B.R. 792, 801 (Bankr.S.D.N.Y.2003) (Gerber, J.) ("*Sterling Optical*").

32. *Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 404 (Bankr.S.D.N.Y. 2004) (Gerber, J.) ("*Adelphia*").

33. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) ("*Pacor*"); *Publicker Industries, Inc. v. U.S. (In re Cuyahoga Equipment Corp.)*, 980 F.2d 110 (2d Cir.1992); *Weisman v. Southeast Hotel Properties Ltd. Partnership*, 1992 WL 131080, at *3 (S.D.N.Y.1992) (Mukasey, C.J.) (quoting *Pacor*); *Hunnicutt Co., Inc. v. TJX Companies, Inc. (In re Ames Department Stores, Inc.)*, 190 B.R. 157, 160 (S.D.N.Y.1995) (Koeltl, J.).

34. *See* 307 B.R. at 413–414.

35. *See Rednel Tower, Ltd. v. Riverside Nursing Home (In re Riverside Nursing Home)*, 144 B.R. 951, 955 (S.D.N.Y.1992) (Broderick, J.); 176–60 *Union Turnpike, Inc. v. Howard Beach Fitness Center, Inc.*, 209 B.R. 307, 310, n. 2 (S.D.N.Y.1997) (Sprizzo, J.).

36. *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 86 F.3d 364, 372 (4th Cir.1996) (quoting *Matter of Wood*, 825 F.2d 90, 97 (5th Cir.1987)); *see also, e.g., Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir.2003) (same, quoting *A.H. Robins*); *Poplar Run Five Ltd. P'ship v. Virginia Electric & Power Co. (In re Poplar Run Five Ltd. P'ship)*, 192 B.R. 848, 857 (Bankr. E.D.Va.1995) (Bostetter, C.J.) (same).

37. *Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223 (2d Cir.2002).

38. *See* n. 29 above.

In *Petrie Retail*,[39] a lease assignee of the debtor, Marianne Ltd., had purchased the lease at issue pursuant to a sale order of the bankruptcy court.[40] Prior to the sale order, the lessor, Luan Investment S.E. (Luan), filed a proof of claim for additional rent pursuant to an escalation clause in the lease.[41] Under the *Petrie Retail* sale order, certain liabilities of the estate were excluded, including "defaults under the assigned contracts that existed prior to the assignment and any other obligations arising prior to, and required to be performed prior to, the assignment, unless Marianne specifically assumed the obligations."[42] The sale order also provided that those entities holding any excluded liabilities were further barred and enjoined from asserting against Marianne any default or breach under the leases that was outstanding as of the date of closing.[43] The bankruptcy court retained "sole and exclusive jurisdiction over all matters arising from or related to the [lease], the [debtor's motion seeking approval of the assumption and assignment of certain unexpired leases], the Transaction Documents, the implementation thereof and [the Sale] Order."[44]

Ten months after the sale transferring the lease to Marianne was closed, on September 27, 1999, Luan sent a letter to Marianne declaring it in default and announcing its intention to terminate the lease for nonpayment of rent.[45] Marianne then filed a motion in the bankruptcy court for an order in aid of consummation of the plan.[46] Around the same time, Luan filed a lawsuit against Marianne for back rent in Puerto Rico.[47] The bankruptcy court entered an order granting the plan consummation motion and enjoined Luan from "commencing, continuing or prosecuting any action contingent upon the interpretation of the . . . provisions of the leases at issue before this Court."[48] The district court affirmed the bankruptcy court's order, and the Second Circuit affirmed as well.

In its *Petrie Retail* holding, the Second Circuit concluded that the bankruptcy court did have subject matter jurisdiction over the dispute between the lease assignee-tenant and its landlord, and indeed that the dispute was a core matter. It did so by reason of three factors.

First, the dispute was based on rights established in the sale order. The *Petrie Retail* court noted, in that connection, that orders approving the sale of property were core bankruptcy proceedings, and that although the original lease was a prepetition contract, "many of [the lease assignee] Marianne's rights with respect to the lease were established as part of the core bankruptcy court function of approving the sale of the Petrie property."[49] The *Petrie Retail* court further noted, in that connection, that the bankruptcy court found that the landlord Luan's demand of the lease assignee-tenant Marianne involved excluded liabilities as defined in the sale order, and

---

**39.** Here, in the interests of economy, the Court has largely adopted Judge Patterson's discussion of the facts in *Petrie Retail* as set forth in *Millenium Seacarriers*, with which this Court fully concurs.

**40.** 304 F.3d at 226.

**41.** *Id.*

**42.** *Id.*

**43.** *Id.*

**44.** *Id.* (alterations in original).

**45.** *Id.* at 227.

**46.** *Id.*

**47.** *Id.*

**48.** *Id.* (alterations in original).

**49.** *Id.* at 229–230.

that the contract dispute between Luan and Marianne "involved rights specifically established by the sale order." [50] Thus, the dispute between the landlord and its new tenant was "inextricably linked to the bankruptcy court's Sale Order." [51]

Second, the motion sought "enforcement of a pre-existing injunction issued as part of the bankruptcy court's sale order and confirmation order." [52] The bankruptcy court retained post-confirmation jurisdiction to enforce its own orders, particularly when disputes arose over a bankruptcy plan of reorganization. [53]

Third, the dispute between Luan and Marianne involved an issue already before the bankruptcy court as part of its consideration of the landlord's claim against the estate, and thus the dispute "uniquely affected and was uniquely affected by the core bankruptcy functions as to 'matters concerning the administration of the estate,' and the 'allowance or disallowance of claims against the estate.'" [54] That was so because "the interpretation of the lease was originally raised as part of the bankruptcy court's core function of determining whether to allow Luan's claim in the administration of the estate." [55]

The Second Circuit then held that the "combination of factors in this case leads us to conclude that the plan consummation motion was a core proceeding because it was not independent of the reorganization." [56]

Two of the three factors present in *Petrie Retail*, which two, in this Court's view, would have led to the same conclusion, [57] are likewise present here. [58] Here the dispute is "based on rights established in the sale order" (*Petrie Retail* factor # 1), though here it arises from two separate orders—the Designation Rights Order and the Assignment Order. As in *Petrie Retail*, those orders were entered in core bankruptcy proceedings. And though (again as in *Petrie Retail*), the lease that was the subject of the sale and assignment

50. *Id.*

51. *Id.* at 230 (quoting *Comco Assocs. v. Faraldi Food Indus.*, 170 B.R. 765, 772 (E.D.N.Y. 1994) (Wexler, J.)).

52. *Id.*

53. *Id.* While the *Petrie Retail* court thought this principle to be "particularly" applicable in cases when disputes arose over a bankruptcy plan of reorganization, this Court believes that the principle plainly applies even when that is not the case.

54. *Id.* (quoting from 28 U.S.C. § 157, which addresses the "core matters" that an Article I bankruptcy judge, and not just an Article III district judge, can decide) (citation omitted).

55. *Id.*

56. *Id.* at 231.

57. The *Petrie Retail* court declined to decide whether any one of those factors alone would render a proceeding core. *See* 304 F.3d at 231. The logic underlying the *Petrie Retail* court's discussion suggests that any *one* would. But it is sufficient for the purposes of this discussion for this Court to determine that two of the three (*i.e.*, factors # 1 and # 2) would.

58. This Court has of course noted that *Petrie Retail* was a 2–1 decision, and, needless to say, has carefully considered the dissent in that case. But even a 2–1 decision is binding authority on this Court. Moreover, the Court is not at all sure that Judge Jacobs, the dissenter in *Petrie Retail*, would dissent here, where as alleged (and, as discussed above and below, now established), there is not an effort to secure unpaid post-assignment rent, a legitimate landlord concern (frustration of which troubled Judge Jacobs), but rather there is an effort to circumvent unquestionably binding orders of the bankruptcy court entered in connection with the underlying assignment. Thus it is reasonable to believe that all three of the judges on the *Petrie Retail* court would be comfortable with the result this Court reaches here.

was a prepetition contract, significant NWL rights with respect to the lease were established as part of the core bankruptcy court functions of the sale and assignment of the lease under the Designation Rights Order and Assignment Order. Just as "many of [the *Petrie Retail* lease assignee] Marianne's rights with regard to the lease were established as part of the core bankruptcy court function of approving the sale of the Petrie property," [59] NWL's rights here were established as part of the core bankruptcy functions of consideration of the Falls Church Store lease sale, under section 363, and assumption and assignment, under section 365. And though the nature of the landlord's complaint here is different (and does not involve, as it did in *Petrie Retail*, unpaid post-assignment rent), it still involves, as in *Petrie Retail*, "rights specifically established by the sale order." [60] Here, as in *Petrie Retail*, the dispute is "inextricably linked" to the bankruptcy court's earlier "Sale Order[s]."

Further, the Court's need to interpret and enforce its own earlier orders (*Petrie Retail* factor # 2) is likewise present here. Though the order to be enforced in *Petrie Retail* was described as an injunction, and here the orders simply authorized the conduct of which the landlord Eden Center now complains, they both invoke the common principle, as described in *Petrie Retail*, that a bankruptcy court retains jurisdiction to interpret and enforce its own orders. [61]

Likewise, in *Millenium Seacarriers*, the dispute between the parties involved the resolution of rights enumerated in a Sale Order there involving the priority of liens (one a ship mortgage, and the other a claimed maritime lien) asserted against the property that had been sold. After the bankruptcy court ruled in favor of the indenture trustee, the district court affirmed the bankruptcy courts determination, expressly considering the matter of subject matter jurisdiction. After lengthy discussion of *Petrie Retail*, the *Millenium Seacarriers* court relied, in material part, upon the bankruptcy courts express reservation of jurisdiction in its sale order to determine the disputes involving the priority of liens. That fact alone provided jurisdiction; the *Millenium Seacarriers* court observed that "[i]n this case, as in *Petrie*, the dispute between the parties involves the resolution of rights enumerated in the Sale Order." [62]

As in *Petrie Retail* and *Millenium Seacarriers*, this Court has subject matter jurisdiction to enforce its orders not only because they were entered in proceedings in a case under title 11 (and, indeed, in a core function) with respect to which it undoubtedly had subject matter jurisdiction, [63] but also by reason of the power granted to any federal court to enforce it own orders. That is particularly so since this Court twice expressly reserved jurisdiction in each of the Designation Rights Order and the Assumption Order to do so. This Court has an important interest in ensuring that its orders are not circumvented, and Eden Center's contentions that this Court lacks the jurisdiction to do

---

**59.** 304 F.3d at 229–230.

**60.** *Id.* at 230.

**61.** *Id.*

**62.** 2004 WL 63501 at *5. That analysis also reinforces this Court's view, as stated above, that this factor, standing alone, would confer subject matter jurisdiction on this controver-

sy, and, even more plainly, that this factor, when joined with a second factor, would.

**63.** *See, e.g., Concerto Software, Inc. v. Vitaquest Intern., Inc.,* 290 B.R. 448 (D.Me.2003) ("A bankruptcy court retains jurisdiction to interpret its own orders.") (citing *Petrie Retail* ).

so, by reason of the procedural setting in which Eden Center wishes to circumvent them, are wholly inconsistent with the caselaw described above.

## II.

■ The standards for issuance of a preliminary injunction in this Circuit, and for the issuance of an injunction under section 105(a), are well known, and need not be discussed at length here. To prevail on a motion for a preliminary injunction, the moving party must show: (a) that it will suffer "irreparable harm in the absence of an injunction" and "(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." [64]

Here the Court finds, as a mixed question of fact and law, that NWL plainly has shown irreparable injury, by reason of the threatened loss of its business at the Falls Church Store.[65] The impairment of

NWL's right to invoke this Court's continuing jurisdiction constitutes irreparable harm as well.[66]

■■ And an injunction here is appropriate not just to meet the needs and concerns of a private litigant, NWL; it also is appropriate to meet the needs and concerns of the Court. Section 105(a) provides:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

This Court, like most bankruptcy courts, invokes section 105(a) with restraint, and never inconsistently with, or to circumvent, other provisions of the Code. But it is

---

**64.** *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 172 (2d Cir.2001); *see also Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994); *Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 415 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *In re Netia Holdings, S.A.*, 278 B.R. 344, 352 (Bankr. S.D.N.Y.2002) (Gerber, J.); *Petition of Caldas*, 274 B.R. 583, 598 (Bankr.S.D.N.Y.2002) (Gerber, J.).

**65.** *See D.B. Indy, L.L.C. v. Talisman Brookdale L.L.C.*, 2004 WL 432225 at *3, 2004 U.S. Dist. LEXIS 3300 at *6–*8 (D.Minn.2004) (in suit brought by tenant against landlord, asserting interference with its right of access to the premises, rejecting contention that tenant had an adequate remedy at law); *Progressive Restaurant Systems, Inc. v. Wendy's Int'l, Inc.*, 1990 WL 106719 at *2, 1990 U.S. Dist. LEXIS 9289 at *4–*5 (N.D.N.Y.1990) (McAvoy, J.) ("[t]he threat of bankruptcy or loss of a party's business, absent the granting of preliminary relief, constitutes irreparable injury, for otherwise a final judgment might be useless").

**66.** *See In re Johns–Manville Corp.*, 97 B.R. 174, 181 (Bankr.S.D.N.Y.1989) (Lifland, C.J.) (finding irreparable harm to future asbestos claimants by the filing of litigation in other forums in violation of claims procedures set forth in the debtors' confirmed reorganization plan, thereby defeating the court's continuing jurisdiction to implement the plan).

As this Court stated in its ruling on the TRO application here:

> And certainly[,] putting this Court into a jurisdictional battle with a Virginia state court, especially if it were necessary or appropriate to get things right, for me later to have ·to void or consider voiding the order of a Virginia state court, especially in light of the *Rooker–Feldman* Doctrine, all of those matters in my mind plainly provide a second basis for the finding of irreparable injury as well.

TRO Hrg. Tr. at 73 (transcription errors corrected).

manifestly proper, in this Court's view, to invoke section 105(a) "to enforce or implement" the Court's earlier orders, and to prevent abuses of process. Exercise of the Court's section 105(a) authority in this manner, and for this purpose, vindicates the interests of the *Court*, as much as (and perhaps more than) it vindicates the interest of an individual litigant. Particularly in such a situation, it is not surprising that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a).[67]

NWL has also shown a likelihood of success on the merits. As noted above, the Court has found as a fact that Eden Center, acting through Mr. Ebenstein, raised the issue of the renovations as a pretext to try to recover the Falls Church Store, notwithstanding the Court's earlier orders, to facilitate Eden Center's economic interests, and to facilitate Mr. Ebenstein's alternate plan for the property, to develop it as a "mini-mall" for merchants in the Vietnamese–American community-consistent with Mr. Ebenstein's desire to terminate the Eden Center lease now, "for whatever reason," and to seek to re-let it. NWL has shown, at the least, a strong likelihood of success on its claims that Eden Center has sought to deny NWL the fruits of this Court's earlier orders, which expressly granted NWL leave to make the renovations it now seeks to make.[68]

### III.

■ There remains the issue of the appropriate breadth of the preliminary injunction. For the reasons set forth above, this Court will enjoin Eden Center from taking any steps to terminate NWL's tenancy as a consequence of renovations in the Falls Church Store. The Court then considers the extent to which it should enjoin other actions that have the purpose or effect of frustrating this Court's earlier orders, even though they do not involve permitted renovations.

While the Court continues to feel, as it noted at both the TRO hearing and the hearing on this preliminary injunction motion, that it should not assume a continuing role as an "L & T court" with respect to every dispute that may arise between NWL and Eden Center over the course of their future relations with each other,[69] it also feels that it should ensure that its earlier orders are not frustrated. For this reason, and because evidence at the pre-

---

**67.** *See LTV Steel Co. v. Board of Education (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988) (Leval, J., then a District Judge); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y.1987) (Sweet, J.); *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988) (Brozman, J.).

**68.** Many bankruptcy courts have also considered whether issuance of an injunction would be in the public interest, particularly when requested under section 105(a). That requirement is easily satisfied here. The public has a strong interest in ensuring that the orders of a bankruptcy court (like any other court) cannot be circumvented.

Under the circumstances of this case, the Court does not need to address the alternate showing which is also sufficient to obtain a preliminary injunction in this Circuit, serious issues going to the merits, and a tipping of the equities dramatically in favor of the movant. It does note, however, that NWL has shown an entitlement to a preliminary injunction on this alternate ground as well. Here NWL has shown much more than serious issues going to the merits, and the equities resulting from the injury to it, discussed above, greatly outweigh those in favor of Eden Center, which, under its lease (originally to Ames and now to NWL), would not be regaining possession for many years, and which at this juncture is merely being denied the windfall that would result from getting control of the Falls Church store at an earlier date.

**69.** *See, e.g.*, Hrg. Tr. at 230.

liminary injunction hearing caused this Court to conclude that Eden Center is continuing to look for bases to circumvent this Court's orders based on alleged NWL offenses beyond those relating to renovations, the Court concludes, in the exercise of its discretion, that the breadth of its order—albeit not as broad as that originally proposed by NWL—should be broader than the TRO this Court entered before it heard all of the evidence ultimately submitted at the preliminary injunction hearing.

Eden Center's effort to evict NWL for alleged defaults arising with respect to rent that already has been paid epitomizes the Court's concerns. The legitimate needs and concerns of a landlord to get its rent paid are one thing; the efforts of a landlord to declare defaults based on rent that already has been paid, as a means to recapture the leasehold and circumvent the Court's earlier orders, are quite another.

At the TRO hearing, mindful of concerns voiced by Judge Jacobs of the Second Circuit in his dissent in *Petrie Retail* and of legitimate needs and concerns of landlords to secure the payment of unpaid rent, this Court expressed a disinclination to get involved in payment of rent disputes. But that was in the context of the possibility that NWL had not paid its rent, and the Court's belief that if such were the case, it would be inappropriate to intervene. Those concerns do not carry over to a situation involving Eden Center's efforts to find still another basis to evict NWL, even though the full rent *was* paid.

The Court continues to be of the view, as it put it in oral argument, that the Court should not provide a "Get Out of Jail Free Card" to NWL with respect to unpaid rent, or any other legitimate default. But given Eden Center's history, the Court is of the view that it should formulate a mechanism to protect NWL from continuing harassment, and to avoid frustration of the Court's orders. At the same time, the Court believes that it should not foreclose Eden Center from relief should there ever be, during the course of the preliminary injunction, a failure to pay rent or other bona fide default.

The Court thus believes, in the exercise of its discretion, that it can and should balance these concerns (and also avoid establishing itself as an L & T court) by requiring Eden Center to first obtain leave of this Court before embarking on future efforts to declare defaults on the Falls Church Store lease, and thereby terminate NWL's tenancy. If rent is unpaid, or if there is evidence of a bona fide default under the lease (or a good faith dispute with respect to that), or if there is a future pattern of late-paid rent, leave to proceed elsewhere likely will be granted. If, on the other hand, the Court sees more of what it has seen to date, leave to proceed likely will be denied.

At this juncture, however, all of Eden Center's pending efforts to evict NWL-based on renovations and also in the action that the Court understands has been filed in Virginia with respect to rent previously paid [70]—must cease.

70. This Court expects that this decision, including its factual findings, will be shared with the Virginia court. But this Court has intentionally refrained from communicating in any other fashion with the Virginia court with respect to this matter; this Court wishes to provide opportunity for the parties first to be heard as to whether it appropriately should do so. This Court also has intentionally refrained from enjoining the Virginia court or staying its action, and this Court's preliminary injunction now simply runs, in personam, to Eden Center and its agents and attorneys. As they prepare for proceedings on a permanent injunction, the parties should be

*IV.*

A preliminary injunction in accordance with the foregoing accompanies this Decision.

prepared to address future actions by this Court with respect to these matters.